On Return to Remand

WINDOM, Presiding Judge.
David Phillip Wilson appeals his two capital-murder convictions and sentences of death. Wilson was convicted of one count of capital murder for taking the life of Dewey Walker during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and a second count of capital murder for taking the life of Dewey Walker during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975. By a vote of 10-2, the jury recommended that Wilson be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Wilson to death.
After Walker, a 64-year-old man suffering from cancer, failed to show up for work for several consecutive days in April 2004, his supervisor, Jimmy Walker,[1] went to his house to check on him. After two trips to check on Walker were unsuccessful, Jimmy Walker spoke with Walker’s neighbor, and the neighbor telephoned the police. On April 13, Officer Lynn Watkins and Officer Rhett Davis of the Dothan Police Department responded to the call and conducted a “welfare check” at Walker’s house.
During the welfare check, Officer Watkins walked around to the back of the house. The back of the house had two doors, a wooden door and a sliding-glass door. Officer Watkins noticed that the door knob to the wooden door was missing. She entered through that doorway and found herself in a storage area, separated from the primary residence by a panel of drywall. The wall had a hole in it leading to a bedroom. It appeared to Officer Watkins that someone had created the hole from the outside because there was broken drywall on the bedroom floor. Officer Watkins entered the bedroom through the hole in the drywall. She testified at trial *749 that, in her opinion, the hole was large enough for Wilson. Officer Watkins and Officer Davis conducted a search of Walker’s residence. Walker’s body was found in the kitchen with a large amount of dried blood surrounding his head.
Investigator Tony Luker of the Dothan Police Department was assigned to investigate Walker’s death. In addition to the blood found near Walker’s body, Investigator Luker discovered blood droplets throughout the house. He also discovered that the doors to multiple bedrooms, which apparently had been locked, were pried open and that there were holes in the walls of several rooms. Investigator Luker testified that it appeared as though someone had been searching for something hidden in the walls.[2]
In the kitchen, Investigator Luker recovered an extension cord and a computer-mouse with the attached cord snapped into two pieces, which, based on the ligature marks on Walker’s neck and the dried blood on the cords, appeared to have been used to strangle Walker. Investigator Luker also found a screwdriver and a portion of the computer-mouse cord in the refrigerator.
Investigator Luker also noticed that Walker’s custom van, replete with stereo equipment estimated to be worth $20,000, was missing. A search for the van and the stereo equipment led investigators to Matthew Marsh. Investigator Luker interviewed Marsh, and then interviewed Catherine Corley and Michael Jackson. These interviews led Investigator Luker to Wilson.
Officers arrived at Wilson’s home in the early morning hours of April 14. Wilson voluntarily went with the officers to the Dothan Police Department. After waiving his Miranda[3] rights, Wilson gave a statement to Investigator Luker and Sergeant Mike Etress.
Wilson told the officers that he went to Walker’s house around 3 p.m. on April 6. Walker was home, and Wilson spoke to him about Walker’s son Chris. Wilson left, but came back a few hours later. Wilson said that the front door was partially open when he returned, so he walked into the house. Walker was not home when Wilson arrived. While Wilson was inside Walker’s house, he received a telephone call from Marsh, asking him to steal the keys to Walker’s van. Wilson explained to the officers that he, Marsh, Jackson, and Corley had previously discussed “hitting Mr. Walker and knocking him out and taking the keys.” (C. 517.) Wilson took the keys and went to Marsh’s house.
According to Wilson, he returned to Walker’s house the next evening to steal a laptop computer. He went to the back of the house and entered the storage area. Wilson stated that there was a small crack in the wall and that he made it large enough to enter the main house. Wilson took a metal baseball bat with him because, according to him, he was scared of Walker’s dog.[4] Once inside, he again received a telephone call from Marsh asking him to search for items in addition to the laptop that would be worth stealing. Wilson used a screwdriver to pry open several doors in the house.
*750 After approximately 20 minutes, Walker returned home and went to the kitchen. Wilson assumed that Walker heard him because he picked up a knife.[5] Wilson said that he approached Walker from behind with the baseball bat and attempted to disarm Walker by striking him on his right shoulder. According to Wilson, he missed and accidentally struck Walker in the back of his head. Walker fell into the wall, cutting his head, but stood back up. Wilson grabbed a nearby computer-mouse cord and wrapped it around Walker’s neck in an attempt to make Walker drop the knife. The computer-mouse cord snapped, so Wilson grabbed a nearby extension cord. Wilson stated that he wrapped the extension cord around Walker’s neck and held it until Walker passed out. He estimated that he choked Walker for six minutes. Wilson told the officers that he threw the extension cord down in front of the refrigerator and placed the computer-mouse cord inside the refrigerator. Wilson was scared, so he left the house, taking with him Walker’s laptop and one of Walker’s baseball hats. Wilson further indicated that he did not telephone an ambulance for Walker because he was in a state of panic. According to Wilson, Walker was still breathing when he left.
Wilson went back to Marsh’s house where he, Marsh, and Corley unsuccessfully attempted to login to Walker’s password-protected laptop. The three individuals then went back to Walker’s house in order to steal the van. During their first attempt to take the van, however, the alarm on the van went off, so they left.
Wilson made similar attempts to steal Walker’s van on Thursday and Friday, but was foiled both times by the alarm on the van. Wilson spoke with Corley, who was familiar with alarm systems, about disabling the alarm in Walker’s van. Wilson returned to the van on Sunday morning. He lifted the hood of the van to access the alarm system, and the alarm again sounded. Wilson left and drove around for about 20 minutes before returning. When he returned, he was able to disable the alarm system by cutting two wires. Wilson drove to Marsh’s house, picked up Marsh, and drove back to Walker’s house. Wilson drove the van to Marsh’s house. At Marsh’s house, they removed the stereo equipment from the van and split it among Wilson,[6] Marsh, Jackson, and Corley. Then they hid the van on Marsh’s property located outside the city limits of Dothan.
Dr. Kathleen Enstice, who at the time of Walker’s death was a forensic pathologist with the Alabama Department of Forensic Sciences, performed Walker’s autopsy. The results of the autopsy conflicted with Wilson’s account of a single, accidental blow to Walker’s head. Dr. Enstice testified that Walker had fresh defensive wounds on his hands and arms. She gave a conservative estimate of 114 contusions and abrasions on Walker’s body, 32 of which were on his head. Additionally, Walker had multiple skull fractures and three separate lacerations on his scalp. Walker also suffered eight broken ribs and a fracture to his sternum. Dr. Enstice ruled out the possibility that these injuries could have been sustained by a single blow to the head and a subsequent fall.

Standard, of Review

Because Wilson has been sentenced to death, this Court must search the record *751 for “plain error.” Rule 45A, Ala. R.App. P. Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
“[T]he plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error aversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, “ ‘ “not only seriously affected] [the appellant’s] ‘substantial rights,’ but ... also ha[d] an unfair prejudicial impact on the jury’s deliberations.” ’ ” Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Only when an error is “so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings” will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). Although the “failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice.” Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) (citing Bush v. State, 431 So.2d 563, 565 (1983)) (emphasis in original). As the United States Supreme Court has noted, the appellant’s burden to establish that he is entitled to reversal based on an unpre-served error “is difficult, ‘as it should be.’ ” Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423,173 L.Ed.2d 266 (2009) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)).
I.
Wilson first argues that the State used its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 85, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This issue was not raised at trial; therefore, it was initially reviewed for plain error only. Rule 45A, Ala. R.App. P.
On November 5, 2010, this Court stated:
“Here, both Wilson and the State ask this Court to remand this cause to the circuit court to provide the State with an opportunity to explain its reasons for striking African-American venire-members. This Court’s ‘review of the record indicates that, if the defense had *752 filed a Batson motion at trial raising the arguments he now raises, the trial court would have been obligated to require the prosecution to state the reasons for each of its peremptory challenges.’ Whatley v. State, [Ms. CR-08-0696, Oct. 1, 2010] — So.3d -, - (Ala.Crim.App.2010). Because Wilson did not raise a Batson objection at trial, the State did not have an opportunity to respond to his allegations or to provide its reasons for striking African-American venire-members. Further, the circuit court is in a better position to evaluate the parties’ arguments and to rule on the propriety of the State’s reasons for striking African-Americans because it was present during the jury-selection proceedings.”
Wilson v. State, 142 So.3d 732, 747 (Ala.Crim.App.2010).
“Thus, in accordance with the parties’ request, this Court remand[ed] this cause to the circuit court for that court to hold a hearing during which it [was] to require the State to provide its reasons for striking African-American veniremembers and [was] to provide Wilson with an opportunity to ‘offer evidence showing that the [State’s] reasons or explanations are merely a sham or pretext.’ ”
Wilson, 142 So.3d at 747-48 (quoting Preachers v. State, 963 So.2d 161,166 (Ala.Crim.App.2006)).
On February 23, 2011, the circuit court conducted a hearing in accordance with this Court’s instructions. On March 15, 2011, the circuit court issued a detailed order finding that the State had not used its peremptory strikes to remove jurors based on race. Specifically, the circuit court found:
“that the State articulated clear specific and legitimate reasons for each peremptory strike exercised by the State to strike an African-American venire-member. Further, the Court finds that [Wilson] has not proven purposeful discrimination by showing that the race neutral reasons given by the State for each peremptory strike used to remove each of the identified African-American veniremembers was merely a pretext or sham for discrimination.”
(C. on remand at 40.)
On return to remand, Wilson argues that the circuit court erroneously found that the State met its burden to provide valid race-neutral reasons for striking potential jurors J.C., J.D., and D.W.[7] Specifically, Wilson argues that the State’s reason for striking potential juror J.C. — that it would be tough for him to recommend a sentence of death — was pretextual because the prosecutor targeted African-Americans with leading questions regarding their ability to recommend a sentence of death. Wilson also argues that the State’s reasons for striking potential juror J.D.— he was young and had a Law Enforcement Tactical System (“LETS”) record — were pretextual because age is a suspect reason and because other white jurors who had traffic tickets were not struck. Wilson next argues that the State’s reason for striking potential juror D.W. — that he had 14 traffic violations and a LETS record— was pretextual because white jurors who had traffic tickets were not struck and because the prosecutor did not question D.W. regarding his LETS record. Finally, Wilson argues that the circuit court erroneously failed to consider a history of ra *753 cial discrimination by the Houston County District Attorney’s Office.
In evaluating a Batson claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97, 106 S.Ct. 1712[, 1723 (1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
537 U.S. at 328-29.
Recently, in Thompson v. State, [Ms. CR-05-0073, Feb. 17, 2012] — So.3d —,—(Ala.Crim.App.2012), this Court explained:
“ ‘ “After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson [v. Kentucky ], 476 U.S. [79,] 97, 106 S.Ct. [1712,] 1723 [(1986)]. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986) ].”
“ ‘Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“ ‘ “Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’ Id. ‘[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly within the trial judges’s province.”’ Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.”
“ ‘Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).’
“Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
“ ‘ “When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.” Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). “A trial court is in a far better position than a reviewing court to rule on issues of credibility.” Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). “Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether *754 discriminatory patterns exist in the selection of juries.” Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘ “Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will ‘largely turn on evaluation of credibility' 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.”
“ ‘Hernandez v. New York, 500 U.S. 352, 365 (1991).’
“Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010).
“ ‘[W]hen more than one reason was given for striking some venire-members, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect. See Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App.1989).'
“Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). ‘ “So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.” ’ Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
“ ‘Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.' Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). ‘A determination regarding a moving party’s showing of intent to discriminate under Batson is “ ‘a pure issue of fact subject to review under a deferential standard.' ” Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).’ Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.' Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).”
Thompson, — So.3d at—.
With these principles in mind, this Court turns to Wilson’s arguments.
A.
Wilson first argues that the State failed to rebut the prima facie showing of racial discrimination with respect to potential juror J.C. Specifically, he argues that the prosecutor’s reason for striking potential juror J.C. was pretextual; therefore, he is entitled to a new trial.
The prosecutor testified that he struck J.C. because J.C. stated that it would be tough for him to recommend a sentence of death. The circuit court found, and this Court agrees, that the prosecutor’s proffered reason is facially race neutral. Mashburn v. State, 7 So.3d 453, 461 (Ala.Crim.App.2007); Hocker v. State, 840 So.2d 197, 210 (Ala.Crim.App.2002). Thus, the burden shifted to Wilson to establish that the prosecutor’s reason was pretextual. Ex parte Branch, 526 So.2d 609, 624 (Ala.1987).
Wilson argues that the prosecutor’s reason was pretextual because the prosecutor targeted African-Americans with questions regarding their opposition to the *755 death penalty. In addressing this argument, the circuit court found:
“[Wilson] argues that the State’s questioning or addressing directly seven out of the eight African-Americans on the venire panel during voir dire as opposed to only addressing five out of thirty-eight whites with regard to their ability to impose death indicates disparate treatment of African-American venire-members. Further, [Wilson] argues that such direct questioning is an indicator that veniremember number 18, [J.C.], received disparate treatment because he was struck based on his response that it would be tough to render a death penalty recommendation. According to the testimony of [the prosecutor], no white veniremembers indicated that they would have difficulty in imposing the death penalty. However, the State proffered testimony that it struck [B.S.C.], a seventy-two year white female veniremember, because Lt. Luker personally knew her and thought she would be weak. Lastly, the Court finds no merit in [Wilson’s] argument that the form of the questions posed to individual veniremembers with regard their ability to impose the death penalty somehow constitutes disparate treatment. The Court finds that [Wilson’s] argument is without merit and the State’s reasons for striking [J.C.] [were] race neutral.”
(C. on remand at 38-39.) Based on the record, this Court cannot say that the circuit court’s finding were clearly erroneous.
The record indicates that the prosecutor asked the entire venire whether there was anyone who “just do[es not] believe in the death penalty.” (R. 93-94.) The prosecutor then questioned the five Caucasians, seven African-Americans, and one Asian regarding their feelings toward the death penalty.[8] (R. 93-104). The record is unclear whether these jurors indicated some nonverbal responses to the prosecutor’s general question regarding their belief in the death penalty, thus prompting the prosecutor to question them further. However, Wilson has not offered any evidence to establish that these jurors did not take some action to indicate a possible opposition to the death penalty and, therefore, prompted the prosecutor’s direct questions about the death penalty. Furthermore, the record does not indicate that the questions posed to white potential jurors about the death penalty differed materially from those posed to African-American jurors. Therefore, Wilson has not established that the prosecutor targeted African-Americans with his questions about the death penalty.
Because the record does not establish that the prosecutor targeted African-Americans with questions about the death penalty, this Court cannot say that the circuit court clearly erred in finding that Wilson had not met his burden to establish that the State’s facially race-neutral reason for striking J.C. was pretextual. Therefore, Wilson is not entitled to any relief on this issue.
B.
Wilson next argues that the State failed to rebut the prima facie showing of racial discrimination with respect to potential jurors J.D. and D.W. Specifically, he argues that the State’s reasons for striking potential jurors J.D. and D.W. were pre-textual; therefore, he is entitled to a new trial.
*756 The prosecutor testified that he struck J.D. because J.D. had a LETS record. According to the prosecutor, LETS tracks individuals’ criminal histories. The prosecutor also testified that he struck D.W. because D.W. had received 14 traffic tickets and also had a LETS record. The circuit court found, and this Court agrees, that J.D.’s and D.W.’s criminal histories were a facially race-neutral reason for the State’s use of its peremptory strikes. Welch v. State, 63 So.3d 1275, 1283 (Ala.Crim.App.2010); Thomas v. State, 611 So.2d 416, 418 (Ala.Crim.App.1992). Thus, the burden shifted to Wilson to establish that the prosecutor’s reasons were pretex-tual. Ex parte Branch, 526 So.2d at 624.
Wilson argues that the prosecutor’s reliance on criminal histories to strike J.D. and D.W. was pretextual because the “prosecution allowed three white individuals to serve on the jury who had at least one and as many as five traffic violations.” (Wilson brief on remand, at 13.) In addressing this argument, the circuit court found as follows:
“[Wilson] ... argues that the State relied upon the [criminal] record of certain black veniremembers as a pretext in striking them. The State indicated that it relied upon the record, in whole or part, of the following veniremembers in reaching its decision to strike them: veniremember number 73, [D.W.], veniremember number 14, [J.D.,] and veniremember number 41, [B.L.]. With regard to veniremember number 73, [D.W.], the State specifically relied upon his LETS record and fourteen speeding citations. In reaching the decision to strike veniremember number 14, [J.D.], the State specifically relied upon his LETS record. The State relied upon the DUI conviction of veniremember number 41, [B.L.], in making the decision to strike her.
“[Wilson] further argues that the State engaged in disparate treatment of African-American veniremembers who had some type of record by not striking white veniremembers who had similar records. Specifically, [Wilson] argues that the State did not strike venire-member number 36, [C.K.], who had a speeding ticket, veniremember number 67, [S.T.], who had a speeding ticket and a [ticket for] failure to stop, and venire-member number 42, [R.L.], who had two speeding tickets and a no-seatbelt violation. In response, [the prosecutor] testified that he did not have any information regarding the traffic violations for those veniremembers. *757 18, [C.L.G.], had DUI convictions. With regard to the existence of a record as a basis for striking veniremembers, the State’s reason for striking venire-member number 73, [D.W.], and venire-member 14, [J.D.], who are African-Americans, was based in whole or part on the existence of a LETS record and veniremember number 18, [C.L.G.], a white female, was struck for the existence of a record which was not specifically identified. The fact that the State struck white veniremembers with the same or similar records as the African-American veniremembers clearly rebuts the argument by [Wilson’s] counsel that the State’s reliance on the records of African-Americans as basis to strike them was merely a pretext. Accordingly, the Court finds that the State did not engage in disparate treatment of African-American veniremembers who had some sort of record, whether it was a LETS record, traffic violation, or other criminal history.”
*756 “The State actually struck certain white veniremembers based in whole or part, on their records, specifically, veniremember number 54, [A.P.], venire-member number seven, [C.M.B.], venire-member number 58, [D.E.S.], Jr., veniremember number 9, [G.C.], and veniremember number 18, [C.L.G.]. The State relied upon [A.P.’s] conviction for driving while licensed revoked and seven DUI charges, which he did not disclose during voir dire, in making its decision to strike him. Regarding [C.M.B.], the State relied upon a DUI conviction which she did not disclose. With regard to [D.E.S.], the State relied upon his conviction for unlawful possession of a controlled substance. With regard to [G.C.] the State relied upon his conviction for DUI. Although the State did not specifically identify a particular crime or traffic violation for [C.L.G.], it did rely upon the fact that she had a record in reaching its decision to strike her. A further analysis of the State’s use of peremptory strikes to remove veniremembers with criminal convictions reveals that veniremember 41, [B.L.], had a DUI conviction and white veniremember 54, [A.P.], 7, [C.B.] and
*757 (C. on remand 36-38.) The circuit court’s findings are supported by the record.
Wilson, however, argues that the circuit court clearly erred by determining that the prosecutor’s reasons for striking J.D. and D.W. were not pretextual. First, he argues that the record establishes that the prosecutor’s reliance on J.D.’s and D.W.’s LETS records and traffic tickets was pre-textual because the State did not strike three white juror who had traffic tickets. He then argues that “the trial court improperly credited the prosecution’s excuse that it did not possess any information about these [white] juror’s traffic violations.” (Wilson’s brief on remand, at 14.) This Court disagrees.
It is well settled that “[a] trial court’s ruling on a Batson motion depends on its credibility determinations.” Douglas v. State, 740 So.2d 485, 487 (Ala.Crim.App.1999) (citing Smith v. State, 590 So.2d 388, 390 (Ala.Crim.App.1991)). This Court has “recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge’s province, and ... in the absence of exceptional circumstances, [this Court] defer[s] to the [the trial court].” Thompson, — So.3d at— (internal citations and quotations omitted). In other words, this Court “will give a trial court’s ruling great deference, and we will reverse its ruling only if it is clearly erroneous.” Douglas, 740 So.2d at 487.
Here, the prosecutor testified that he did not have any information regarding the three white jurors’ traffic tickets. The circuit court believed the prosecutor and credited his reasons for failing to strike those white jurors. Thus, the circuit court found that Wilson had not established disparate treatment. Nothing in the record establishes that the circuit court’s credibility determination was clearly erroneous; therefore, Wilson is not entitled to any relief on this issue.
Second, Wilson argues that the trial court improperly credited the prosecutor’s reliance on J.D.’s LETS record to strike him because the prosecutor failed to specify what type of crime J.D. may have committed. While the prosecutor did not specify what crime or crimes were reflected on J.D.’s LETS record, he did testify that LETS covers people who have been charged with all types of crimes. Thus, the fact that J.D. had a LETS records is facially race neutral, and the burden shifted to Wilson to show that the reason was a pretext. Ex parte Branch, 526 So.2d at 624.
Third, Wilson argues that the circuit court should not have credited the prosecutor’s reasons for striking both J.D. and D.W. because the prosecutor did not admit documentary evidence of those individuals’ LETS records. This Court has held that *758 “[t]here is no requirement that a prosecutor establish evidentiary support for every strike in every case....” Hall v. State, 816 So.2d 80, 85 (Ala.Crim.App.1999). Rather, during the third step in the Bat-son process, Wilson had the burden to establish that the prosecutor’s reason was a pretext. Ex parte Branch, 526 So.2d at 624. However, when cross-examining the prosecutor during the hearing, Wilson failed to ask the prosecutor any questions regarding the prosecutor’s records relating to J.D.’s and D.W.’s criminal records. See Welch v. State, 63 So.3d 1275, 1278 (Ala.Crim.App.2010) (recognizing that the State’s burden is to offer facially race-neutral reasons, after which the burden shifts to the defendant “to offer evidence showing that those reasons are merely a sham or pretext”). Thus, Wilson failed to meet his burden “to offer evidence showing that those reasons are merely a sham or pretext.” Welch, 63 So.3d at 1278.
Finally, the State struck similarly situated white potential jurors. As the circuit court found in its order, the State struck a number of white jurors because they had traffic tickets and other convictions. The State also struck one juror based on an unspecified criminal record. The prosecutor’s use of its peremptory strikes to remove white jurors who were similarly situated to J.D. and D.W. weighs against Wilson’s claim of racial discrimination and supports the circuit court’s judgment. See Hall, 816 So.2d at 86 (holding that “comparable treatment of similarly situated jurors of both races tends to rebut any inference of discriminatory intent in the prosecutor’s strikes against black jurors”).
For the foregoing reasons, Wilson failed to meet his burden to establish that the prosecutor’s reason for striking J.D. and D.W. was a pretext.[9] Further, based on the - record, the circuit court’s ruling was not clearly erroneous. Therefore, Wilson is not entitled to any relief on this issue.
C.
Wilson next argues that the circuit court erroneously failed to consider seven court opinions that he asserts support his argument that the Houston County District Attorney’s Office struck J.C., J.D., and D.W. for racial reasons. Specifically, Wilson argues that the circuit court should have considered the following cases: 1) Grimes v. State, 93-cv-215 (M.D. Ala. June 12, 1996) (unpublished); 2) McCray v. State, 738 So.2d 911 (Ala.Crim.App.1998); 3) Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); 4) Andrews v. State, 624 So.2d 1095 (Ala.Crim.App.1993); 5) Bush v. State, 615 So.2d 137, 140 (Ala.Crim.App.1992); 6) Williams v. State, 620 So.2d 82 (Ala.Crim.App.1992); and 7) Roger v. State, 593 So.2d 141 (Ala.Crim.App.1991). According to Wilson, these cases establish that the Houston County District Attorney’s Office has a history of racial discrimination and thus should have been considered.
Initially, the record is unclear as to whether the circuit court considered these cases. Although the circuit court stated during the hearing that it was not going to *759 consider Wilson’s cases, it stated in its order that Wilson “raise[d] an argument that the Houston County District Attorney’s Office has a history of discrimination against African-American jurors and in support of that argument cited seven cases.” (C. on remand 39.) Therefore, it appears that the circuit court was aware of the fact that convictions secured by the Houston County District Attorney’s Office had been reversed on Batson grounds seven times.
In any event, assuming, without deciding, that the circuit court did not, but should have, considered the cases Wilson cited, this Court finds any error harmless. Rule 45, Ala. R.App. P.
In McCray v. State, 88 So.3d 1, 24 (Ala.Crim.App.2010), this Court stated:
“[T]o the extent that the Houston County District Attorney’s Office has a history of racial discrimination, that history is attenuated. ‘The opinions reversing the Houston Circuit Court on Batson grounds date from 1991, [over 20] years ago. The most recent of those opinions was published in 1998, [over 12] years ago.’ Floyd[ v. State, [Ms. CR-05-0935, Aug. 29, 2008] — So.3d —(Ala.Crim.App.2007) ] (opinion on return to remand) (Welch, J., dissenting). See McCray v. State, 738 So.2d 911, 914 (Ala.Crim.App.1998) (reversing the judgment of the Houston County Circuit Court based on a Batson violation). Accordingly, although the Houston County District Attorney’s Office ha[d] a history of using its peremptory strikes in an improper manner, this factor, based on the passage of time, does not establish a prima facie case of racial discrimination.”
In addition to the passage of time attenuating the significance of the history of discrimination, Wilson’s counsel conceded at the hearing that “one of the factors that is just a factor in this case — it’s a very, very small part of our case — is that the Court is supposed to look to a history discrimination.” (R. on remand 66; emphasis added.)
As discussed above, the State gave valid reasons for striking potential jurors J.C., J.D., and D.W. Based on the attenuated significance of the history of discrimination by the Houston County District Attorney’s Office and the fact that the history was “a very, very small part” of Wilson’s case, this Court holds that if the circuit court did not consider Wilson’s seven cases, that error did not affect the outcome of the proceeding and, thus, any error was harmless. Rule 45, Ala. R.App. P.; Hinkle v. State, 67 So.3d 161, 166 (Ala.Crim.App.2010) (finding an error harmless when it did “not affect the outcome of the trial, or otherwise prejudice a substantial right of the [appellant]”). Therefore, Wilson is not entitled to any relief on this issue.
II.
Wilson next argues that during closing arguments in the guilt phase, the prosecutor improperly questioned him after he had exercised his Fifth Amendment right not to testify. Specifically, Wilson asserts that during the guilt-phase closing argument, the prosecutor “directly questioned Mr. Wilson in front of the jury....” (Wilson’s brief, at 8.) According to Wilson, “[b]y questioning [him] in front of the jury ... [the prosecutor] violated [his] right to remain silent.” (Wilson’s brief, at 25.) Wilson further argues that the prosecutor’s “direct confrontation of [him], at a time when [he had invoked his right not to testify and] was powerless to respond, exploited Mr. Wilson’s decision not to take the stand” and constituted reversible error. (Wilson’s brief, at 26.) This Court notes that Wilson did not object to the prosecutor’s statements at trial; therefore, *760 this issue will be reviewed for plain error only. Rule 45A, Ala. R.Crim. P.
Wilson bases his assertion that the prosecutor directly questioned and confronted him after he had invoked his right to remain silent on the following portion of the prosecutor’s closing argument:
“This is the back of his head, good people, that was crushed with the lacerations where the bleeding came from the Scalp from the back where he was hit.
“Oh, excuse me. From the statement, Mr. Wilson, you said you hit him accidentally. Accidentally.
“What part of your body tells you to take this bat and swing it and hit somebody? It’s the brain. The brain tells the body — it runs down through the nerves and the hands and tells you to swing that bat.
“Accidentally. Accidentally.”
(R. 606.)
This Court has explained that “[i]n judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Phillips v. State, 65 So.3d 971, 1038 (Ala.Crim.App.2010) (citations and quotations omitted). Further, “[a] prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.” Id. (citations and quotations omitted). “Questions of the propriety of argument of counsel are largely within the trial court’s discretion ... [and this Court] will not reverse the judgment of the trial court unless there has been an abuse of that discretion.” Id. (citations and quotations omitted).
The Court has further explained:
“ ‘A comment on the defendant’s failure to testify is to be “scrupulously avoided.” Arthur v. State, 575 So.2d 1165, 1186 (Ala.Crim.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991). “Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant’s right to remain silent has been violated.” Windsor v. State, 593 So.2d 87, 91 (Ala.Crim.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969). “In a case where there has been only an indirect reference to a defendant’s failure to testify, in order for the comment to constitute reversible error, there must be a close identification of the defendant as the person who did not become a witness.” Windsor v. State, supra, quoting, Ex parte Williams, 461 So.2d 852 (Ala.1984).
“ ‘ “ ‘Alabama law clearly holds that “[w]here there is the possibility that a prosecutor’s comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Alabama of 1901], is violated.” ’ Ex parte Wilson, 571 So.2d 1251, 1262 (Ala.1990). However, “a prosecutor may legitimately base his argument on the evidence of the appellant’s statement” to the police. Hereford v. State, 608 So.2d 439, 442 (Ala.Crim.App.1992). See also Henderson v. State, 584 So.2d 841, 855 (Ala.Crim.App.1988); Smith v. State, 588 So.2d 561, 570 (Ala.Crim.App.1991); Kimble v. State, 545 So.2d 228, 230 (Ala.Crim.App.1989); Brinks v. State, 500 So.2d 1311, 1314-15 (Ala.Crim.App.1986). “Argument by the prosecution concerning omissions and inconsistencies in the defendant’s version of the case is not improper.” Salter v. State, 578 So.2d 1092, 1096 (Ala.Crim.App.1990), cert. denied, 578 So.2d 1097 (Ala.1991).’ ”
*761 Phillips, 65 So.3d at 1033 (quoting Taylor v. State, 808 So.2d 1148, 1185-87 (Ala.Crim.App.2000), quoting in part Mosely v. State, 628 So.2d 1041, 1042 (Ala.Crim.App.1993)). See also Burgess v. State, 827 So.2d 134, 168 (Ala.Crim.App.1998) (“It was not an impermissible comment on Burgess’s right to remain silent for the prosecutor to question Burgess’s truthfulness in making his statement.”).
Contrary to Wilson’s assertions, the prosecutor did not question or confront him during closing arguments. Instead, the prosecutor addressed a portion of Wilson’s statement in which Wilson told law-enforcement officers that he accidentally hit Walker in the head with the baseball bat. Specifically, after acknowledging for the jury that Wilson told the officers that he accidentally hit Walker, the prosecutor asked the jury the following rhetorical question: “What part of your body tells you to take this bat and swing it and hit somebody?” (R. 606.) Thereafter, in arguing that Wilson did have the requisite intent, the prosecutor answered his question saying, “It’s the brain.” Id. In other words, the prosecutor did not improperly question Wilson after he had invoked his right not to testify. Instead, the prosecutor permissibly argued that the jury could infer from the manner in which Walker was murdered that Wilson had the intent to murder Walker.
Because Wilson has not established that the prosecutor’s argument was improper, he has not met his burden to establish plain error. Therefore, Wilson is not entitled to any relief on this issue.
III.
Wilson next argues that the circuit court erroneously allowed the State to admit into evidence his statement to police. Specifically, Wilson argues that the State cannot meet its burden to establish that his statement was voluntarily given because the statement was not fully recorded. From there, Wilson argues that his statement was involuntary because the investigator did not record everything that was said. Wilson then argues that because the entire statement was not recorded, admission of the recorded portion was error because it was “unreliable,” it “prevent[ed] the jury from achieving a fair and impartial understanding of the statement,” and it “dis-tortfed] the confession’s meaning and significance.” (Wilson’s brief, at 31-32.) Wilson did not raise these arguments in the circuit court; therefore, this Court will review these arguments for plain error only.[10] Rule 45A, Ala. R.App. P.
During the suppression hearing and at trial, Investigator Luker testified that he and Officer Jeff Lindsey, a transport officer, went to Wilson’s mobile home and asked Wilson to come with them to the police station to be interviewed about an incident. Wilson agreed, and he rode with Officer Lindsey to the police station. Officer Lindsey did not question Wilson during the drive between Wilson’s mobile home and the police station.
After they arrived at the police station, Officer Lindsey escorted Wilson to the “detective bureau” where Investigator Luker and Sergeant Etress were waiting. (R. 13.) Wilson was then taken into the conference room. At that time, the conference room was not equipped with video *762 equipment capable of producing visual recordings.
Before Wilson was asked any questions, Investigator Luker read Wilson his Miranda rights, and he went over a waiver-of-rights form with Wilson. According to Investigator Luker, Wilson appeared to understand each of the rights on the waiver-of-rights form and voluntarily signed the waiver. Investigator Luker further explained that Wilson did not appear to be under the influence of alcohol or drugs when he waived his Miranda rights. Investigator Luker also stated that no one offered Wilson any promises or inducements to waive his rights and that he was not threatened in any manner. According to Investigator Luker, Wilson understood his rights and voluntarily waived those rights.
Investigator Luker stated that Wilson signed the waiver-of-rights form at 4:12 a.m. Thereafter, between 4:12 a.m. and 5:02 a.m., Wilson outlined the events surrounding Walker’s murder. According to Investigator Luker, he did not know what Wilson was going to say, so he did not initially record the interview. Thus, the conversation between 4:12 a.m. and 5:02 a.m. was not recorded. However, at 5:02 a.m., after Wilson made incriminating statements, Investigator Luker audio-recorded Wilson’s statement. After Investigator Luker began recording the statement, Wilson stated that he had been read his rights, that he understood those rights, and that he had voluntarily waived them. He further stated that he had not been threatened, coerced, or promised anything in exchange for his statement.
Investigator Luker testified that although the beginning of the statement was not recorded, the portion of the statement Wilson made before Investigator Luker began recording did not differ from the recorded portion of the statement. In other words, after Wilson made his initial incriminating statement, Investigator Luker immediately had Wilson repeat his statement while tape-recording it. Investigator Luker further explained that during the interview, the tape they were using to record Wilson ran out without Investigator Luker noticing. Thus, Investigator Luker failed to turn the tape over and did not record the last 10 minutes of the interview. Investigator Luker stated that the recorded portion of Wilson’s statement did not differ from the portions that were not recorded. Stated differently, the last 10 minutes of Wilson’s statement did not provide any new or differing details of the crime.
A.
To the extent Wilson argues that the circuit court erroneously allowed the State to admit the recording of his statement because the State cannot meet its burden to establish that the statement was voluntarily given when the statement was not fully recorded, he has not met his burden to establish that plain error occurred.
“It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.” Waldrop v. State, 859 So.2d 1138, 1155 (Ala.Crim.App.2000) (citing Jackson v. State, 562 So.2d 1378, 1380 (Ala.Crim.App.1990)). In Wilkerson v. State, 70 So.3d 442, 460 (Ala.Crim.App.2011), this Court explained that “[t]o establish a proper Miranda predicate, the State must prove that ‘the accused was informed of his Miranda rights before he made the statement’ and that ‘the accused voluntarily and knowingly waived his Miranda rights before making his statement.’ ” (quoting Jones v. State, 987 So.2d *763 1156, 1164 (Ala.Crim.App.2006)). This Court also explained that in determining whether an individual “voluntarily, knowingly, and intelligently” waived his Miranda rights, courts must consider “the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials in conducting the interrogation.” Wilkerson, 70 So.3d at 460 (quoting Foldi v. State, 861 So.2d 414, 421 (Ala.Crim.App.2002)).
Similarly, “ ‘[t]o prove [the] voluntariness [of the confession], the State must establish that the defendant “made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.” ’ ” Wilkerson, 70 So.3d at 460 (quoting Eggers v. State, 914 So.2d 883, 898-99 (Ala.Crim.App.2004), quoting in turn, Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App.1988)). “[A] confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency.” McLeod v. State, 718 So.2d 727, 729 (Ala.1998) (citing Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). Like reviewing a Miranda waiver, “when determining whether a confession is voluntary, ... court[s] must consider the totality of the circumstances surrounding the confession.” Wilkerson, 70 So.3d at 460 (quoting Maxwell v. State, 828 So.2d 347, 354 (Ala.Crim.App.2000)).
Although the State must establish that a defendant was read the Miranda rights, that he voluntarily waived those rights, and that he voluntarily gave the statement, the State is not, as Wilson argues, required to produce a full recording of the defendant’s statement to establish these prerequisites to the admission of the statement into evidence. To the contrary, this Court has held:
“ ‘ “ ‘The state is not required to prove all that the accused said when he confessed because the accused himself has the right to prove the remainder of his statement.’ [C. Gamble,] McElroyl’s Alabama Evidence], § 200.17 at 446 [ (3rd ed.1977) ].” ’ Sneed v. State, 1 So.3d 104, 126 (Ala.Crim.App.2007), cert. denied, Sneed v. Alabama, [555 U.S. 1155 (2009) ], quoting, Barrow v. State, 494 So.2d 834, 840 (Ala.Crim.App.1986). Furthermore, the failure to record a portion of an interview is a matter to be considered as affecting the weight to be accorded the statement rather than its admissibility. See Centobie v. State, 861 So.2d 1111, 1120 (Ala.Crim.App.2001) (part of statement was not recorded because the tape was inserted in the wrong direction; however the tape was admissible). Smith v. State, 756 So.2d 892, 931 (Ala.Crim.App.1997) (where the officer failed to record a portion of the interrogation when he advised Smith of his Miranda rights would not render the statement inadmissible, but would be taken into consideration by the jury in determining the weight and credibility to assign to the officer’s testimony regarding the appellant’s confession).”
Johnson v. State, 120 So.3d 1130, 1175 (Ala.Crim.App.2009). “[T]he fact that a videotaped recording d[oes] not include the entire statement does not render the recording inadmissible; [rather,] that fact affects only the weight that the recording should be given by the jury.” Minor v. State, 780 So.2d 707, 735 (Ala.Crim.App.1999), reversed on other grounds, 780 So.2d 796 (Ala.2000) (citations omitted).
Considering the totality of the circumstances, the State presented sufficient evidence to establish the prerequisites to the *764 admission of Wilson’s statement. Investigator Luker testified that before Wilson gave his statement, Investigator Luker read Wilson his Miranda rights. Wilson did not appear to be under the influence of alcohol or drugs and appeared to understand his rights. Wilson signed the waiver-of-rights form. The form Wilson signed stated that he had read his rights, that he understood his rights, and that he waived those rights without being offered any promises or receiving any threats. (C. 428.) Investigator Luker further testified that no one offered Wilson any promises or made any threats before or during Wilson’s statement.
In addition to Investigator Luker’s testimony, this Court has listened to the recorded portion of Wilson’s statement. On the recording, Wilson states that he was read his rights and that he understood those rights. Wilson does not sound as though he was under the influence of any intoxicant. Further, Wilson states that he has voluntarily waived his rights. Finally, Wilson states that no one made any promises or threatened him in an attempt to force him to give his statement.
Based on the foregoing evidence indicating that Wilson was read his Miranda warnings, that he understood and voluntarily waived his Miranda rights, and that he chose to make a statement without any promises or threats, Wilson has not established that the admission of his statement resulted in any error, plain or otherwise. Therefore, Wilson is entitled to no relief on this claim.
B.
To the extent Wilson argues that the recording of his confession was unreliable and misleading because the statement was not fully recorded, this argument is also without merit.
This Court has held that omissions in a recording of a statement do not render the recording inadmissible unless the omitted “‘portions were “so substantial as to render the recording as a whole untrustworthy.” ’ ” Revis v. State, 101 So.3d 247, 265 (Ala.Crim.App.2011) (quoting United States v. Greenfield, 574 F.2d 305, 307 (5th Cir.1978), quoting in turn United States v. Avila, 443 F.2d 792, 795 (5th Cir.1971)). See Blanton v. State, 886 So.2d 850, 868 (Ala.Crim.App.2003) (holding that inaudible or missing portions of a recording will not render the recording inadmissible when the missing portions do not appear to affect “the accuracy of the substance of the conversations or otherwise detract from the purpose for which the audiotapes were admitted”). The failure to record a part or parts of a statement will not render the recording of the statement inadmissible so long as the recorded portion “include[s] ‘substantially’ all of the ‘pertinent conversations.’ ” Revis, 101 So.3d at 264 (quoting State v. Hester (No. A-7130-03T4, November 14, 2006) (N.J.Super.A.D.2006) (not reported in A.2d)).
Here, Investigator Luker testified that the statement Wilson made before Luker began recording did not differ from the recorded statement. That is, during the recorded portion of the statement, Wilson merely repeated information he had already provided to Luker. Investigator Luker also explained that Wilson did not say anything materially different after the recording stopped as compared to what was recorded. Additionally, this Court has listened to the recording of Wilson’s statement, and there is no indication that the recording is unreliable or untrustworthy. Finally, Wilson has not pointed to any portion of the recording that he believes is inaccurate, unreliable, untrustworthy, or distorts the meaning of the confession. Consequently, Wilson has not established *765 that the omitted portions of the statement rendered the statement, as a whole, untrustworthy and thus has not established that any error, much less plain error, resulted from admitting the recording. Therefore, Wilson is not entitled to any relief on this issue.
IV.
Wilson next argues that his confession and the evidence seized from his mobile home should be suppressed as the fruit of an illegal arrest. Specifically, Wilson asserts that he was arrested in his mobile home without a warrant. According to Wilson, “[a]bsent consent, only exigent circumstances can justify a warrant-less arrest of a person in his home.” (Wilson’s brief, at 33.) Wilson next alleges that the State failed to present any evidence establishing exigent circumstances for his in-home, warrantless arrest; therefore, his confession, which he gave after that arrest, is the fruit of an illegal arrest and should have been suppressed. Wilson also argues that because his ill-gotten confession was used to obtain the search warrant that justified the seizure of evidence from his mobile home, that evidence should also be suppressed as the fruit of an illegal arrest. Although Wilson raised in the circuit court numerous grounds for the suppression of his statement and the evidence seized from his mobile home, he did not argue that his arrest was illegal because the State failed to establish exigent circumstances. Therefore, this issue will be reviewed for plain error only. See Davis v. State, 42 So.3d 162, 168 (Ala.Crim.App.2009) (“The statement of specific grounds of objection waives all grounds not specified.... ”); Rule 45A, Ala. R.App. P.
The evidence presented at thé suppression hearing indicates that each of Wilson’s accomplices gave statements to law-enforcement officers in which they confessed. “According to Catherine Nicole Corley[,] a co-defendant[,] Wilson was to get half of the audio equipment from [Walker’s] van because he had taken all of the chances in [the] burglary, theft and murder.” (C. 419.)
After obtaining statements from Wilson’s accomplices implicating Wilson in Walker’s murder, Investigator Luker and Officer Lindsey went to Wilson’s mobile home. They arrived at the mobile home on April 14, 2004, at 3:50 a.m. Investigator Luker knocked on the door, and Wilson’s mother answered.
At that time, Wilson was asleep in his bedroom, so his mother awakened him. When Wilson came out of his bedroom, Investigator Luker asked Wilson “if he would come with [them] to talk ... about an incident,” and according to Investigator Luker, Wilson “voluntarily agree[d] to come.” (R.' 12.) Investigator Luker explained that Wilson was not arrested at that point because he voluntarily agreed to come to the police station, but if he had not agreed to come to the police station, he would have been arrested.
Wilson rode with Officer Lindsey to the police station and was escorted to a conference room in the “detective bureau.” (R. 13.) At some point, Wilson was placed in handcuffs. As discussed above, once in the conference room, Wilson was read his Miranda rights, he waived those rights, and he voluntarily confessed to his participation in Walker’s murder.
It is well settled that a law-enforcement officer may, consistent with the Fourth Amendment to the United States Constitution, execute a warrantless arrest in public when the officer has probable cause to believe that the person arrested has committed a crime. See United States v. Watson, 423 U.S. 411, 423, 96 *766 S.Ct. 820, 46 L.Ed.2d 598 (1976); New York v. Harris, 495 U.S. 14, 18, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (recognizing that “it ha[s] long been settled that a warrantless arrest in a public place was permissible as long as the arresting officer had probable cause ... ”); Virginia v. Moore, 553 U.S. 164, 173, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008); Bush v. State, 523 So.2d 538, 546 (Ala.Crim.App.1988); § 15-10-3, Ala.Code 1975. Based on the sanctity of home, however, the Fourth Amendment gives greater protection from in-home warrantless arrests. See Payton v. New York, 445 U.S. 573, 588-602,100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Under that greater protection, “a warrantless and nonconsensual entry into a suspect’s home for the purpose of effectuating a felony arrest is ... unreasonable and prohibited by the Fourth Amendment unless the State proves both probable cause and exigent circumstances.” Washington v. State, 922 So.2d 145, 158-59 (Ala.Crim.App.2005); see also Payton, 445 U.S. at 587-88, Kirk v. Louisiana, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002), Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), Ex parte Moffitt, 844 So.2d 531, 533 (Ala.2002). Thus, if law-enforcement officers cannot justify a warrantless, in-home arrest with consent or both probable cause and exigent circumstances, then any evidence collected or obtained inside the defendant’s home during that illegal arrest must be suppressed under the exclusionary rule adopted by the Supreme Court of the United States. See Payton, 445 U.S. at 587-88.
Of course, a person may voluntarily accompany officers to the police station and that “person’s decision [will not] support a conclusion that that person is under arrest [for Fourth Amendment purposes].” Marshall v. State, 992 So.2d 762, 768 (Ala.Crim.App.2007) (citing Smith v. State, 797 So.2d 503, 529 (Ala.Crim.App.2000)). It follows that a person may also voluntarily leave that person’s home and enter a public area where that person may, consistent with the Fourth Amendment, be arrested without a warrant based on probable cause alone. See State v. Solberg, 122 Wash.2d 688, 861 P.2d 460, 465 (1993) (“Police may make a warrantless arrest of a suspect, if it is based upon probable cause, when the suspect voluntarily exits his or her residence to speak to officers on an unenclosed front porch of a home.”).
Even when an individual does not voluntarily exit his home and is arrested by law-enforcement officers without exigent circumstances, the exclusionary rule does not require the exclusion of all evidence obtained as a result of that arrest. See United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (“declining] to adopt a ‘per se or “but for” rule’ that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest”). For instance, in New York v. Harris, 495 U.S. 14, 17-21, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the United States Supreme Court held that the exclusionary rule applied in Payton, 445 U.S. at 587-88, does not require the suppression of a confession made outside of the home by a defendant who was arrested in the home upon probable cause but without exigent circumstances in violation of Payton. The Court explained that the requirement that the police have a warrant or probable cause and exigent circumstances “is imposed to protect the home, and anything incriminating the police gathered from arresting [a defendant] in his home, rather than elsewhere.... ” *767 Harris, 495 U.S. at 20.. Thus, when officers effectuate a warrantless, in-home arrest with probable cause but no exigent circumstances, the exclusionary rule operates only to exclude evidence obtained in the home during the unlawful arrest. Id.; see also Ex parte Rieber, 663 So.2d 999, 1002-03 (Ala.1995) (stating that “even if there had been no exigent circumstances surrounding [the defendant’s in-home] arrest, his statement, as well as the evidence discovered as a result of his statement ... would have been admissible under the rule stated in New York v. Harris”); Williams v. State, 830 So.2d 45, 50 (Ala.Crim.App.2001).
Here, Investigator Luker had probable cause to arrest Wilson for Walker’s murder.[11] See Dixon v. State, 588 So.2d 903, 906 (Ala.1991) (“Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime.”). Prior to Investigator Luker’s contact with Wilson, each of Wilson’s accomplices had confessed, and one of his accomplices had informed Investigator Luker that ‘Wilson was to get half of the audio equipment from the van because he had taken all of the chances in [the] burglary, theft and murder.” (C. 419.) Based on the accomplice’s confession implicating Wilson in the murder, Investigator Luker had probable cause to arrest Wilson for Walker’s murder. See Vincent v. State, 349 So.2d 1145, 1146 (Ala.1977) (holding that the uncorroborated testimony of accomplice is a sufficient basis for a finding of probable cause).
Further, assuming that Wilson was arrested at some point before his confession, the record indicates that before he was arrested, he voluntarily left his home and was in a public place where he could be arrested based on probable cause alone. See State v. Solberg, 122 Wash.2d 688, 861 P.2d 460, 465 (1993) (“Police may make a warrantless arrest of a suspect, if it is based upon probable cause, when the suspect voluntarily exits his or her residence to speak to officers on an unenclosed front porch of a home.”). Investigator Luker testified that he asked Wilson “if he would come with [the officers] to talk ... about an incident.” Investigator Luker further stated that Wilson “voluntarily agree[d] to come” (R. 12), and that Wilson was not arrested at that point because he had voluntarily agreed to come to the police station.
Because the record establishes that Investigator Luker had probable cause to arrest Wilson and that Wilson voluntarily left his home and entered a public area where he could be arrested based on probable cause alone, Wilson’s arrest was not in violation of the Fourth Amendment. Therefore, Wilson cannot establish that any error occurred from the circuit court’s failure to suppress his statement and other evidence as the fruit of an illegal arrest. Ex parte Walker, 972 So.2d 737, 753 (Ala.2007) (holding that to rise to the level of plain error, the error “must be obvious on the face of the record”).
Moreover, even if Wilson was illegally arrested in his home based on probable cause alone, Payton, 445 U.S. at 587-88, the exclusionary rule would not require suppression of his confession because his confession was given at the police station as opposed to in his home. As stated above, in Harris, 495 U.S. at 21, the United States Supreme Court limited Pay- *768 ton and held that “where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State’s use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton.” See also Ex parte Rieber, 663 So.2d at 1002-03; Williams, 830 So.2d at 50. Because the exclusionary rule does not require the suppression of Wilson’s statement, no error, much less plain error, resulted from the admission of Wilson’s confession or the evidence collected as a result of that confession. Therefore, Wilson is not entitled to any relief on this issue.
V.
Wilson next argues that the circuit court erroneously allowed the State to introduce exhibits and testimony from Dr. Enstice, the forensic pathologist, relating to an autopsy she performed on Walker. Specifically, Wilson argues that the State failed to establish a proper chain of custody for Walker’s body; therefore, the circuit court should not have permitted the State to introduce exhibits or testimony relating to the autopsy performed on Walker. This Court disagrees.
The Alabama Supreme Court in Ex parte Holton, 590 So.2d 918 (Ala.1991), addressed the requirements for a chain of custody:
“Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. [Ex parte Williams, 548 So.2d 518, 520 (Ala.1989) ]. In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).”
590 So.2d at 919-20. Later, in Hale v. State, 848 So.2d 224 (Ala.2002), the Supreme Court reexamined its holding in Holton after the 1995 codification of § 12-21-13, Ala.Code 1975. The Supreme Court stated:
“Section 12-21-13, Ala.Code 1975, provides:
“ ‘Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.’
“(Emphasis added.) This statute, by its terms, applies only to ‘[p]hysical evidence connected with or collected in the investigation of the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence ‘connected with or collected in the investigation.’ Moreover,
“ ‘[i]n Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12-21-13, this court ruled that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: “The eyeglasses *769 were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.” Land, 678 So.2d at 210.’ ”
848 So.2d at 228 (emphasis in original).
Initially, it does not appear that the condition of Walker’s body was an issue at trial. Although Wilson’s counsel read from cases that mention the State’s responsibility to show, as part of a chain of custody, that the physical evidence at the end of the chain is in substantially the same condition as it was at the beginning, he did not argue that Walker’s body was not in substantially the same condition. Instead, counsel argued that the State had not presented sufficient evidence to establish that the body upon which the autopsy was performed was, in fact, Walker’s body.
Contrary to counsel’s argument at trial, the State presented more than sufficient evidence to identify Walker’s body as physical evidence collected in connection to his murder. Officer Lynn Watkins testified that she and the other officers who discovered the body did not disturb the scene. (R. 245-46.) Investigator Luker, who led the investigation, testified that except for being rolled onto its side for a photograph, the victim’s body was not marked, altered, or changed in any way. (R. 290.) Robert Byrd, the coroner, testified that he retrieved Walker’s body from the crime scene and transported it to the Alabama Department of Forensic Sciences (“DFS”). (R. 534.) Byrd further testified that he did not alter or change the body in any manner. (R. 535.) Byrd left Walker’s body and a receipt in a secured facility at the DFS. Jon Thomas testified that on April 14, 2004, he was working for the Dothan DFS facility, that he took the victim’s body from the secured facility where Byrd had left it, that he did not alter the body, and that he transported it to the DFS office in Mobile where he received a receipt for the body. (R. 546, 547, 549-50.) Dr. Enstice testified that the DFS received the body on April 14, 2004, from Jon Thomas and that she was assigned to perform the autopsy. (R. 472-73).
Because the State presented sufficient evidence to establish that Walker’s body— the body upon which the autopsy was performed — was collected in connection with Walker’s murder and because the condition of Walker’s body was not at issue, under § 12-21-13, Ala.Code 1975, the State was not required to establish a complete chain of custody. Therefore, this issue is without merit.
However, even if § 12-21-13, Ala.Code 1975, did not apply, this Court would hold that no reversible error occurred. When the § 12-21-13, Ala.Code 1975, does not apply, the Alabama Supreme Court has explained:
“[T]he State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala.1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
*770 “The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145,159 (1973).
“If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a ‘missing’ link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a ‘weak’ link. When the link is ‘weak,’ a question of credibility and weight is presented, not one of admissibility.”
Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991).
As shown above, the State presented an unbroken chain of custody for Walker’s body from the time it was retrieved at the scene of the murder until the autopsy was performed. With the exception of Dr. Enstice, who performed the autopsy, each link testified to his or her receipt of the body and his or her disposal of the body. Further, each witness testified that he or she did not alter or change the body.[12] Finally, a comparison of photographs taken of Walker’s body at the scene with photographs taken of Walker’s body just before the autopsy indicates that the body was in substantially the same condition at the end of the chain as it was at the beginning.
Based on these facts, this Court holds that the State presented sufficient evidence to establish a chain of custody for Walker’s body. Therefore, Wilson is not entitled to any relief on this issue.
VI.
Wilson next argues that the State engaged in illegal misconduct when it made inflammatory remarks during closing arguments. This Court has explained:
“The following standard of review is used when reviewing claims of improper prosecutorial argument:
““The relevant question is whether the prosecutor’s comments “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594,118 L.Ed.2d 310 (1992).’
“Bonner v. State, 921 So.2d 469, 473 (Ala.Crim.App.2005), quoting Simmons *771 v. State, 797 So.2d 1134, 1162 (Ala.Crim.App.1999).”
Brown v. State, 11 So.3d 866, 907 (Ala.Crim.App.2007). With these principles in mind, this Court turns to Wilson’s arguments.
A.
Wilson argues that the prosecutor made comments for the purpose of arousing the jurors’ personal hostility toward and fear of Wilson. Because Wilson did not object to these alleged instances of misconduct, this claim will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
First, during opening arguments, the prosecutor referenced Wilson returning to Walker’s house with Corley because she wanted to see Walker’s body and referenced Wilson joking with his accomplices about failing to steal the keys to Walker’s van. Wilson asserts that those statements incorporated inadmissible prior-bad-acts and character evidence.
As will be discussed in Part XII of this opinion, the statements cited by Wilson do not constitute “other crimes, wrongs, or acts” prohibited by Rule 404(b), Ala. R. Evid. The statements to which Wilson now objects were based on his statement to police and constituted evidence of the crime for which he was being tried. Therefore, the statements at issue were not instances of prosecutorial misconduct and did not “ ‘so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.’ ” Darden, 477 U.S. at 181, quoting Donnelly, 416 U.S. at 643.
Second, during closing arguments, the prosecutor referred to Wilson as a “coward,” “death and destruction,” and a “cold, calculated, depraved, evil, wicked person.” (R. 607, 612, 613.) Wilson argues that the statements constituted prosecutorial misconduct because they were inflammatory and constituted outright character assaults.
“This Court has repeatedly held that the prosecutor may refer to an accused in unfavorable terms, so long as the evidence warrants the use of such terms. E.g., Nicks v. State, 521 So.2d 1018, 1022-23 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988); Barbee v. State, 395 So.2d 1128, 1134-35 (Ala.Cr.App.1981), and cases cited therein. See also State v. Wilson-Bey, 21 Conn.App. 162, 572 A.2d 372, cert. denied, 215 Conn. 806, 576 A.2d 537 (1990) (characterization of accused as ‘peddling death’ borne out by the evidence); State v. Wiles, 59 Ohio St.3d 71, 571 N.E.2d 97, 117 (1991) (reference to the accused as an ‘ogre,’ a ‘man-eating monster,’ a ‘hideous brutish person,’ and an ‘animal’ were supported by the evidence). While we do not condone the remarks, the characterization of the appellant as ‘death’ and ‘death and destruction’ were amply supported by the evidence.”
McNair v. State, 653 So.2d 320, 341 (Ala.Crim.App.1992). Further,
“ ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of that discretion. Miller v. State, 431 So.2d 586, 591 (Ala.Cr.App.1983).’ ”
Pierce v. State, 576 So.2d 236, 249 (Ala.Crim.App.1990) (quoting Bankhead v. *772 State, 585 So.2d 97, 105 (Ala.Crim.App.1989)).
Here, the evidence indicated that Wilson attacked Walker, a frail, 64-year-old man suffering from cancer, from behind with a baseball bat. Further, Dr. Enstice gave a conservative estimate of 114 contusions and abrasions on Walker’s body, 32 of which were on his head. Wilson also used a computer-mouse cord and, when the computer-mouse cord snapped, an extension cord to strangle Walker.
While this Court has viewed with disfavor similar uses of language like that used by the prosecutor here, it has also consistently held that when such language is supported by the evidence, it does not rise to the level of reversible error. Because the prosecutor’s characterizations of Wilson were supported by the record, the circuit court did not abuse its discretion, much less commit plain error, in allowing the prosecutor’s characterizations of Wilson.
Third, during closing arguments, the prosecutor brandished a baseball bat, swung the baseball bat, and asked the jury how long it would take to swing it 114 times.[13] Wilson argues that the prosecutor’s demonstration was a “theatrical tirade.” (Wilson’s brief, at 41-42.)
“There is no rule of law which limits counsel in debate to mere articulation. Argument by means of illustration, such as exhibiting to the jury models, tools, weapons, implements, and the like, is a matter of every day practice, and the abuse of the utilization of such illustration is a matter for the trial court’s discretion, not to be interfered with unless there has been an abuse of discretion. Accordingly, it has been recognized that an attorney may employ demonstrations during his or her argument if they are reasonably sustained by the evidence, and in a number of cases a demonstration by counsel during closing argument has been held proper.”
Jacob Stein, Stein Closing Arguments § 1:68 (2011-2012 ed.) (footnotes omitted). “Demonstrations and experiments are permitted or prohibited in the trial court’s discretion.” Gobble v. State, 104 So.3d 920, 961 (Ala.Crim.App.2010) (quoting William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 12:25 (3d ed.2006) (footnotes omitted)).
It was undisputed that Wilson attacked Walker with a baseball bat, and there was testimony from Dr. Enstice that Walker sustained at least 114 contusions and abrasions. Thus, the record contains sufficient evidence to sustain the prosecutor’s demonstration during closing arguments.
For the foregoing reasons, Wilson has not met his burden to show that the prosecutor’s comments “so infected the trial with unfairness as to make the resulting conviction a denial of due process” or resulted in plain error. Brown, 11 So.3d at 907 (citations and quotations omitted); Rule 45A, Ala. R.App. P. Therefore, Wil *773 son is not entitled to any relief on these issues.
B.
Wilson also argues that the prosecutor made improper appeals to the jurors’ sympathies toward Walker. Specifically, Wilson cites instances when the State asked the jurors to imagine how Walker felt during the attack. (R. 614-16, 624.) Wilson argues that the State’s most extreme argument was:
“And Dewey would have been able if he were alive to get on this witness stand and say, that’s the man that came in and robbed and burglarized my own home, but I can’t get up here and speak to you, good people, because he splattered me all the way to eternity and back and tortured me and beat me and struck me and ran around, as I laid on the ground, I was in my house—why are you doing this? Quit hitting me. Leave me alone. I am elderly. What do you want from me?”
(R. 607-08.)
Initially, Wilson did not preserve this issue for appellate review. Although Wilson did object to some of the statements at issue, he did not do so on the ground that the State was making improper appeals to the jurors’ sympathies. (R. 608, 614-16.) The statement of specific grounds of objection waives all grounds not specified. Click v. State, 695 So.2d 209, 224 (Ala.Crim.App.1996). Therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
Further, this Court has consistently held that appeals to jurors, asking them to imagine how a victim felt, do not rise to the level of plain error so long as those appeals are based on the evidence. See Bush v. State, 695 So.2d 70, 135-86 (Ala. Crim.App.1995); Daniels v. State, 650 So.2d 544, 560-61 (Ala.Crim.App.1994); McNair v. State, 658 So.2d 320, 333-35 (Ala.Crim.App.1992). Here, the prosecutor’s statement regarding what Walker might say is based on evidence establishing that Wilson attacked Walker and tortured him in an attempt to force Walker into relinquishing his property. See Part VII of this opinion, see McCray v. State, 88 So.3d 1, 39-10 (Ala.Crim.App.2010) (holding that no error occurred by the prosecutor’s relaying to the jury what the victim might say when the statements contained therein are based on the evidence presented at trial). Because the statements at issue were based on the evidence, the statements did not constitute plain error. Accordingly, this issue does not entitle Wilson to any relief.
VII.
Wilson next argues that the prosecutor improperly interjected penalty-phase considerations during his guilt-phase closing argument. Specifically, Wilson argues that the prosecutor improperly argued to the jury that Wilson tortured Walker and caused him a great deal of pain before Walker died. According to Wilson, victim-impact evidence in the form of the level of pain Walker suffered during the murder was irrelevant in the guilt phase of the trial. Wilson also argues that the prosecutor improperly informed 'the jury during the guilt phase that this was a death-penalty case.
To the extent Wilson argues that the prosecutor improperly injected into the guilt phase of the trial issues relating to the pain Wilson caused Walker, this Court disagrees. In McCray v. State, 88 So.3d 1, 38 (Ala.Crim.App.2010), this Court rejected the premise underlying Wilson’s argument—that the pain a capital-murder victim suffers is irrelevant and inadmissible during the guilt phase of a capital-murder trial. Specifically, this Court held that *774 “[t]he pain and suffering of the victim is a circumstance surrounding the murder — a circumstance that is relevant and admissible during the guilt phase of a capital trial.” Id. (citing Smith v. State, 795 So.2d 788, 812 (Ala.Crim.App.2000) (no error in trial court’s questioning witness regarding the number of wounds on the murder victim’s body during guilt phase of capital-murder trial despite appellant’s argument that the number of wounds was relevant only to the penalty-phase issue of whether the murder was especially heinous, atrocious, or cruel)).
More importantly, victim-impact statements typically “describe [only] the effect of the crime on the victim and his family” and, although relevant to the penalty-phase, are inadmissible in the guilt-phase. Payne v. Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, statements relating to the effect of the crime on the victim “are admissible during the guilt phase of a criminal trial ... if the statements are relevant to a material issue of the guilt phase.” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) (emphasis in original); see also Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006) (holding that victim-impact type evidence is admissible in the guilt phase if it is relevant to guilt-phase issues). Rule 401, Ala. R. Evid., provides that “ ‘[r]elevant evidence’ [is any] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
Here, the State’s theory of the case was that Wilson broke into Walker’s house, attacked him, and tortured him in an attempt to force Walker to relinquish his property. During his guilt-phase closing argument, the prosecutor reminded the jury that Wilson was charged with murder committed during the course of a robbery and of a burglary. The prosecutor then argued that it had proved the force element of robbery by establishing that Wilson tortured Walker and caused him a great deal of pain.[14] Because the pain Wilson caused Walker was relevant and admissible to show the force Wilson used against Walker during the robbery, the prosecutor’s argument did not constitute error.
To the extent Wilson argues that the prosecutor improperly injected penalty-phase considerations into the guilt phase when he informed the jury that the case was a death-penalty case, this argument does not entitle Wilson to any relief. The comment of which Wilson complains reads as follows:
“I told you on voir dire. Look at the evidence. I told you you would look at me and say, Valeska, you are the prosecution. The burden is beyond a reasonable doubt. It’s the same as a shoplifting case. Come on, Valeska, this is a death penalty case. You are asking us to convict him of capital murder. There are two offenses charged.”
(R. 618-19.)
First, it does not appear that the prosecutor’s comment was an attempt to inject penalty-phase considerations into the guilt phase. Instead, it appears that the prosecutor was attempting, although somewhat inartfully, to explain that the State’s burden in a capital-murder case is the same as in any criminal case — beyond a reasonable *775 doubt. This Court finds no error in the prosecutor’s explaining the State’s burden of proof.
Moreover, even if this comment were improper, this Court would not find reversible error. This Court has explained:
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead[ v. State], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000).
Here, the prosecutor’s reference to Wilson’s case as being “a death penalty case” (R. 618-19) was isolated. Further, the jury was well aware from the outset of this trial that the State had charged Wilson with two counts of capital murder and that the case might involve the death penalty. More importantly, the prosecutor was not attempting to tell the jury what sentence Wilson should receive; instead, he was merely reminding the jury of the type of case the trial involved. Cf. Stallworth v. State, 868 So.2d 1128, 1157 (Ala.Crim.App.2001) (finding no reversible error in the prosecutor’s guilt-phase argument that the defendant “should face Alabama’s electric chair”).
Because the prosecutor’s guilt-phase statement was isolated, merely reminded the jury of a fact of which it was already aware, and did not relate to what sentence Wilson should receive, this Court holds that the comment did not “so infeet[ ] the trial with unfairness as to make the resulting conviction a denial of due process.” Ferguson, 814 So.2d at 945. Therefore, this issue does not entitle Wilson to any relief.
VIII.
Wilson alleges the prosecutor made improper comments during its penalty-phase closing argument in violation of state and federal law.
“ ‘The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction.’ Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.3d —, — (Ala.Crim.App.2000), aff'd in pertinent part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.3d — (Ala.2003). ‘In reviewing allegedly improper prosecuto- *776 rial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). ‘ “Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala.Crim.App.2004). In addition:
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead[ v. State], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, “‘[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)).
With these principles in mind, this Court addresses each of Wilson’s arguments in turn.
A.
Wilson contends that during the penalty-phase closing arguments the prosecutor impermissibly informed the jurors that they had a duty to impose a death sentence. Specifically, the prosecutor stated:
*777 “I ask you to go back there and go over the evidence as the judge charges you, and come back in like I told you on voir dire, have the courage and the strength — come back in here and look at him and say, we, the jury, in this case, tell you, [Judge], our decision on both of these cases is death, for what the crime you committed against the peace and dignity of the State of Alabama and a 64-year-old man....”
(R. 795.) Shortly thereafter, the prosecutor stated: “It’s hard. It’s not easy. But this case calls for death. Do what’s right.” (R. 796.)
Wilson contends these comments improperly informed the jury it was its duty to return a death sentence and that the comments suggested that voting for a death sentence was both courageous and virtuous. Wilson also argues these comments “severely undermined the reliability of Mr. Wilson’s sentencing determination, and also denied him due process in violation of the Fifth, Sixth, Eight[h], and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.” (Wilson’s brief, at 49-50.) Wilson did not raise these arguments at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
When addressing this issue previously, this Court stated:
“Of course, a prosecutor seeking a death penalty will argue that the aggravating factors outweigh the mitigating factors and that the defendant should receive the death penalty. There is no plain error here.”
McWhorter v. State, 781 So.2d 257, 321 (Ala.Crim.App.1999) (quoting Smith v. State, 727 So.2d 147, 171 (Ala.Crim.App.1998)). Further, a prosecutor’s statement indicating that under the law and the facts of the case, the jury has a duty to recommend a death sentence is not impermissible because the comment does not urge the jury to sentence the defendant to death without regard for the facts or law. Cf. McWhorter v. State, 781 So.2d 257, 321 (Ala.Crim.App.1999). Rather, such comments urge the jury to apply the facts to the law and to impose a death sentence. Id.; Windsor v. State, 89 So.3d 805, 829 (Ala.Crim.App.2011) (upholding prosecutor’s comment that “[t]he right thing to do is sentence Harvey Lee Windsor to death”).
Here, when the comments are read in context, the prosecutor was not urging the jury to sentence Wilson to death regardless of the facts or the law. Instead, the prosecutor informed the jury that when it applies the facts to the law, the appropriate sentence is death. He then urged the jury to be courageous and to do the right thing, which was apply the facts to the law and sentence Wilson to death.
Because the prosecutor did not urge the jury to disregard the facts and the law when recommending a sentence, but instead, argued that a death sentence is appropriate under the facts and the law, no error, much less plain error, occurred. Rule 45A, Ala. R.App. P. Therefore, Wilson is not entitled to any relief on this issue.
B.
Wilson next alleges the prosecutor illegally led the jury to believe that the district attorney’s office made a judgment that death was the appropriate sentence. Specifically, Wilson contends the following comments by the prosecutor constitute reversible error:
“Dewey was a human being. Remember what Mr. Walker said about his employee? He was a frail man. Look at the pictures. He took medication for *778 pain. He worked 12 hours a day. And that sits over there and did that to him. And they say spare his life? No. No. No. There is no more worse crime.... ”
(R. 785.) Additionally, Wilson contends that the following comment rises to the level of reversible error: “... [t]his is a case that calls for the death penalty.” (R. 794.) Wilson further argues that the circuit court should have immediately struck these remarks because it is improper for prosecutors to state their personal opinions dui’ing closing arguments. Finally, Wilson contends that the State is forbidden from leading the jury to believe the State has made a judgment that a particular case warrants the death penalty above other capital cases. In doing so here, Wilson argues the State gave the jurors the impression that the State had already predetermined the appropriate outcome, which undermined the jury’s independent discretion. Wilson did not raise these arguments at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
“ ‘ “[T]he prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.” ’ Henderson v. State, 584 So.2d 841, 857 (Ala.Crim.App.1988) (quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987)). In Nicks v. State, this Court stated:
“ ‘There is a multitude of reported cases concerning derogatory characterization of an accused by a prosecuting attorney in closing arguments. Examples of such cases can be found in Watson v. State, 266 Ala. 41, 44, 93 So.2d 750, 752 (1957); Barbee v. State, 395 So.2d 1128, 1134 (Ala.Cr.App.1981); and the Alabama Digest. The general rule pertaining to such comments is set out in 23A C.J.S. Criminal Law § 1102 (1961), as follows:
“ ‘ “Comments by the prosecuting attorney which refer to, and make unfavorable inferences from, the conduct of accused in the course of the transaction for which he is on trial, or his conduct at any other time or place, or which refer to his character as shown by such conduct, or to his background, breeding, or associations, or to other details of his personal history or characteristics are proper, where the purported facts referred to by counsel are supported by competent evidence in the case, and where the inferences and deductions sought to be made from such facts are within the bounds of proper argument. On the other hand, remarks or argument of the prosecuting attorney concerning the character or conduct of accused, which is not supported by the record or which exceeds the limits of fair argument or inference is improper.
“ ‘ “In a proper case, the prosecuting attorney may characterize accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case, and, where the evidence warrants the belief that accused is guilty, the prosecutor may employ terms appropriate to the nature or degree of turpitude involved in the crime charged; but characterizations not justified by the evidence or the charge which the evidence tends to prove and hence merely abusive, or which are couched in intemperate and inflammatory language are ... improper.” ’ *779 “521 So.2d at 1022-23 (footnotes omitted). See Melson v. State, 775 So.2d 857, 889 (Ala.Crim.App.1999) (prosecutor referred to defendant as ‘cold-blooded murderer’); Kinard v. State, 495 So.2d 705, 711 (Ala.Crim.App.1986) (prosecutor referred to defendant as ‘ “an unmitigated liar and murderer” ’).”
Albarran v. State, 96 So.3d 131, 184 (Ala.Crim.App.2011).
Here, the prosecutor’s statement that “there is no more worse crime” was not a statement of a personal opinion. Rather, the prosecutor was merely characterizing Wilson’s crime. (R. 785). The evidence indicated that Wilson struck Walker in the back of the head with a baseball bat and then strangled him to death with both a computer-mouse cord and an extension cord. Based on the evidence presented at trial, this Court holds that the prosecutor’s characterization did not rise to the level of plain error. Rule 45A, Ala. R.App. P.; Albarran, 96 So.3d at 184.
Further, no error occurred when the prosecutor stated: “This is a case that calls for the death penalty.” (R. 794.) This Court has held:
“In our adversarial system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate. See Hall v. State, 820 So.2d 113, 143 (Ala.Crim.App.1999). On the other hand, it is impermissible for a prosecutor to urge the jury to ignore its penalty-phase role and simply rely on the fact that the State has already determined that death is the appropriate sentence. See [Guthrie v. State, 616 So.2d 914, 931-32 (Ala.Crim.App.1993),] (holding that a prosecutor’s statement that ‘ “[w]hen I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this was a death penalty case, and we still stand on that position” ’ improperly ‘[led] the jury to believe that the whole governmental establishment had already determined that the sentence should be death and [invited] the jury to adopt the conclusion of others, ostensibly more qualified to make the determination, rather than deciding on its own.’).”
Vanpelt v. State, 74 So.3d 32, 91 (Ala.Crim.App.2009).
When viewed in context, the prosecutor’s statement did not urge the jury to ignore its penalty-phase role and simply rely on the fact that the State has already determined that death was the appropriate sentence in this case. Instead, the prosecutor properly argued that, based on the facts and the law, death was an appropriate sentence in this case. Therefore, Wilson has not met his burden to establish that any error, much less plain error, resulted from the prosecutor’s comment. Rule 45A, Ala. R.App. P.
C.
Wilson alleges that the prosecutor erroneously informed the jury that mercy had no place in the sentencing determination. Specifically, Wilson contends that the following comment by the prosecutor was improper: “... David Wilson who wants mercy — I submit to you — when they say mitigating circumstances, ain’t no excuses, a justification.” (R. 785). Wilson asserts that this statement is “fundamentally opposed to current death penalty jurisprudence” pursuant to Drake v. Kemp, 762 F.2d 1449, 1460 (11th Cir.1985). (Wilson’s brief, at 52.)
“ ‘[I]mpeachment of the evidence of a defendant and the matter of impairment of its weight are properly matters for argument of counsel....’” Burgess v. State, 827 So.2d at 162 (Ala.Crim. *780 App.1998) (quoting Mosley v. State, 241 Ala. 132, 136, 1 So.2d 593, 595 (1941)). “Further, ‘[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant.’ ” Vanpelt, 74 So.3d at 90 (quoting Malicoat v. Mullin, 426 F.3d 1241, 1257 (10th Cir.2005)). That is, “the prosecutor, as an advocate, may argue to the jury that it should give the defendant’s mitigating evidence little or no weight.” Mitchell v. State, 84 So.3d 968, 1002 (Ala.Crim.App.2010); see also State v. Storey, 40 S.W.3d 898, 910-11 (Mo.2001) (holding that no error resulted from the prosecutor’s characterization of mitigation as excuses because the “State is not required to agree with the defendant that the evidence offered during the penalty phase is sufficiently mitigating to preclude imposition of the death sentenced and] the State is free to argue that the evidence is not mitigating at all”).
Here, when read in context, the prosecutor argued that the jury should not give Wilson’s mitigation evidence any weight and that Wilson did not, based on the facts and the law, deserve the jury’s mercy in sentencing. These comments are appropriate in “our adversarial system of criminal justice, [where a] prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate.” Vanpelt, 74 So.3d at 91. Consequently, Wilson has not shown that any error, much less plain error, resulted from the prosecutor’s statement. Rule 45A, Ala. R.App. P.
IX.
Wilson next argues that the prosecutor argued facts not in evidence during his closing argument in the penalty phase. Specifically, Wilson complains of the following: 1) the prosecutor’s statement that Wilson or an accomplice drank Walker’s milk and ate his candy bar after the murder; 2) the prosecutor’s statement, “remember the pictures on the walls of his house, of his wife and his children”; and 3) the prosecutor’s statement “that Dr. Ens-tice had done over a thousand autopsies in murder cases, and ... she concluded the injuries Mr. Walker suffered were up there at the top compared to other cases she had observed.” (Wilson’s brief, at 53-54) (citations and quotations omitted.) The State concedes that the prosecutor’s comments were not specifically supported by evidence in the record. The State, however, argues that Wilson did not object to the statements on the ground that they were unsupported by the evidence; therefore, this Court should review them for plain error only. Rule 45A, Ala. R.Crim. P. The State further argues that the prosecutor’s misstatements did not have an adverse affect on the jury’s deliberations; therefore, Wilson cannot establish plain error. Rule 45A, Ala. R.App. P. This Court agrees.
Again,
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead[ v. State], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of coun *781 sel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001).
Moreover, “ ‘ “[t]o rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ ” Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn, Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Thus, “ ‘[t]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ” Ex parte Brown, 11 So.3d at 938 (quoting United States v. Young, 470 U.S. 1,15,105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)) quoting in turn, United States v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). Further, “ ‘[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)).
First, Wilson correctly argues that the prosecutor improperly told the jury that after the murder, Wilson or Cor-ley went into Wilson’s kitchen, drank Wilson’s milk, and ate Wilson’s candy bar because that statement is not supported by evidence in the record. In making this statement, the prosecutor was attempting to show that Wilson and his accomplices were “cold and callous.” (R 785.) Although there is no evidence in the record indicating that anyone drank Wilson’s milk or ate his candy bar, there is ample evidence establishing that Wilson’s behavior and his accomplices’ behavior during and after the murder were unusual, cold, and callous.
The evidence presented at trial established that Wilson broke into Walker’s home and viciously attacked him with a baseball bat, a computer-mouse cord, and an extension cord. During the attack, Walker sustained: 1) multiple fractures to the skull bones; 2) eight broken ribs; 3) a fractured sternum; 4) ligature marks on his neck; and 5) a contusion on his lung. After viciously attacking Walker, Wilson left Walker on the floor of his house to die. Later, Wilson and his accomplices returned to Walker’s house many times. During one of those times, he and Corley went into Walker’s house because Corley wanted to see Wilson’s body. According to Wilson, Corley was excited by and a little thrilled with seeing Walker’s body.
Based on this evidence, the jury must have been well aware that Walker’s murder was vicious. Further, from this evidence, the jury must have inferred that both Wilson’s and his accomplices’ behavior after the murder was unusual, cold, and callous. Because there was more than suf *782 ficient evidence from which the jury could have inferred the aspect of the crime for which the prosecutor’s improper comment was directed to show, this Court cannot say that the prosecutor’s improper comment had an “unfair prejudicial impact on the jury’s deliberations.” Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (citations omitted). Therefore, Wilson has not established plain error. Rule 45A, Ala. R.App. P.
Second, Wilson correctly argues that the prosecutor should not have said, “[RJemember the pictures on the walls of his house, of his wife and his children,” because there was no evidence establishing that the people in the photographs on Walker’s walls were, in fact, his wife and children. However, viewing this comment in conjunction with all the evidence presented at trial; this Court cannot say that the comment had an “unfair prejudicial impact on the jury’s deliberations.” Ex parte Brown, 11 So.3d at 938 (citations omitted).
It is important to note that the jury was informed that Walker had had a wife who had passed away before his murder. Further, this Court has reviewed the video of the crime scene. During a small portion of that video, family-type photographs are visible on the walls of Walker’s house. The photographs depict, among other things, an adult woman and small children. Although there was no evidence establishing that the people in the photographs were Walker’s wife and children, a reasonable inference from the fact that Walker had photographs of these people on his wall is that they were people for whom Walker cared. Thus, the fact that he had family-type photographs of people on his wall establishes the point the prosecutor was attempting to make, i.e., that Wilson “was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on [others].” Ex parte Rieber, 663 So.2d 999, 1005-06 (Ala.1995).
Because the jury must have been well aware that Walker was not a human island, but instead would be missed by others, this Court cannot say that the prosecutor’s improper comment “aversely affected the outcome of the trial.” McCray v. State, 88 So.3d 1, 27 (Ala.Crim.App.2010); see also Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial). Therefore, Wilson has not established that the prosecutor’s comment resulted in plain error. Rule 45A, Ala. R.App. P.
Finally, Wilson argues that the prosecutor should not have stated that Dr. Enstice testified that she had done over 1,000 autopsies in murder cases and that she concluded the injuries Mr. Walker suffered were “at the top” compared to other eases she had observed. (R. 765.) This Court has compared the prosecutor’s statement with Dr. Enstiee’s testimony and agrees that the prosecutor’s statement was not entirely correct; however, the Court is convinced that the minor differences in the prosecutor’s statement and Dr. Enstice’s testimony did not have an “unfair prejudicial impact on the jury’s deliberations.” Ex parte Brown, 11 So.3d at 938 (citations omitted). For instance, Wilson correctly points out that Dr. Ens-tice never stated that she had done over 1,000 autopsies in murder cases; however, she did testify that she had done over 1,000 autopsies without specifying whether those autopsies involved a murder. Further, Dr. Enstice never stated that “the *783 injuries Mr. Walker suffered were up there at the top compared to other cases she had observed.” (Wilson brief, at 54.) However, when asked whether the number of injuries Walker had received was large or small when compared to the number of injuries she had seen during other autopsies, Dr. Enstice testified that she has “seen several other cases and actually performed autopsies on cases where there were large numbers of injuries[,] [a]nd ... Walker certainly had a very large number of injuries.” (R. 531.) Dr. Enstice also testified that many of Walker’s injuries would have been very painful.
Although the prosecutor’s statement was not totally consistent with Dr. Enstice’s testimony, the gist of his statement was correct—that Dr. Enstice was experienced and Walker suffered many painful injuries during the attack. Because the jury was aware that Dr. Enstice was experienced and that Wilson had inflicted a very large number of very painful injuries on Walker, this Court cannot say that the prosecutor’s slight error in recounting Dr. Enstice’s testimony “aversely affected the outcome of the trial.” McCray, 88 So.3d at 27; see also Ex 'parte Walker, 972 So.2d at 752 (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas, 824 So.2d at 13 (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial). Therefore, Wilson has not established that the prosecutor’s comment resulted in plain error. Rule 45A, Ala. R.App. P.
X.
Wilson next argues that the circuit court erred in preventing Wilson’s mother from asking the jury to spare his life during the penalty phase. Wilson contends that his mother’s request to the jury would have gone to Wilson’s character; therefore, it was a relevant mitigating factor and was admissible in the penalty phase.
The following is the relevant excerpt from Wilson’s mother’s testimony during the penalty phase:
Defense: “And you understand that the only two punishments that he can get are life without parole or the death sentence; is that correct?”
Witness: ‘Tes, sir.”
Defense: “And I am going to ask this in a leading way. I think it would be fair to say that you would ask the jury to spare his life?”
State: “Objection. I object.”
Defense: “I can ask her. I mean—”
State: “I object, Judge.”
Court: “I will sustain the objection.”
Defense: “All right. Just a second.
That’s all I have, Your Honor.”
(R. 736-37.)
Here, Wilson’s mother was under direct examination when she was asked whether she wanted the jury to spare Wilson’s life. “Leading questions should not be used on the direct examination of a witness, except when justice requires that they be allowed.” Rule 611(c), Ala. R. Evid. The decision to allow leading questions lies within the sound discretion of the circuit court, and only a flagrant violation of that discretion will create reversible error. McCray v. State, 88 So.3d 1, 34 (Ala. Crim.App.2010). This Court holds that it was not a flagrant violation of the circuit court’s discretion to disallow a leading question during direct examination.
Moreover, even if the question were not leading, the circuit court correctly prevented Wilson’s mother from asking the jury to recommend a sentence of life in prison without the possibility of parole.
*784 This Court has repeatedly held “that the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstance for the jury to consider at the penalty phase of a capital case” and, therefore, is not admissible. Taylor v. State, 666 So.2d 36, 51-53 (Ala.Crim.App.1994). See also Dotch v. State, 67 So.3d 936, 997 (Ala.Crim.App.2010); Barber v. State, 952 So.2d 393, 450 (Ala.Crim.App.2005). Because the opinion of friends and family regarding what sentence a capital defendant should receive is not relevant in the penalty phase, the circuit court did not abuse its discretion by preventing Wilson’s mother from asking the jury to sentence Wilson to life in prison without the possibility of parole. Accordingly, this issue does not entitle Wilson to any relief.
XI.
Wilson next argues that the State improperly elicited victim-impact evidence during the guilt phase of the trial. Specifically, Wilson argues that the State should not have been allowed to elicit testimony from Jimmy Walker, Walker’s supervisor, indicating: 1) that Walker had cancer, that he had lost weight, and that he was frail; 2) that Walker’s wife had died; 3) that Walker was a reliable employee; and 4) that Walker made a decent salary and would have qualified for retirement. According to Wilson, this testimony was irrelevant to the material issues at trial, and served only to focus the jurors’ sympathies on the tragedy of Mr. Walker’s death. Wilson did not object to Jimmy Walker’s testimony; therefore, this Court will review these claims for plain error only. Rule 45A, Ala. R.App. P.
To the extent Wilson argues that Jimmy Walker’s testimony relating to Walker’s illness, his frailty, and his reliability constituted improper victim-impact evidence, this Court disagrees. As stated in Part VII of this opinion, “victim-impact statements typically ‘describe [only] the effect of the crime on the victim and his family’ and, although relevant to the penalty-phase, are inadmissible in the guilt phase.” 142 So.3d at 774 (quoting Payne, 501 U.S. at 821)). However, such statements “are admissible during the guilt phase of a criminal trial ... if the statements are relevant to a material issue of the guilt phase.” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993); see also Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006) (holding that victim-impact type evidence is admissible in the guilt phase if it is relevant to guilt-phase issues). Rule 401, Ala. R. Evid., provides: “‘Relevant evidence’ [is any] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
Here, Jimmy Walker’s testimony describing Walker as having cancer, as being frail, and as being a reliable employee was admissible in the guilt phase of the trial to establish the events that led to the discovery of the crime and the discovery of Walker’s body. See Gissendanner, 949 So.2d at 965. Jimmy Walker testified that Walker had cancer, that he had lost weight, and that he was frail. He also testified that Walker was a reliable employee. According to Jimmy Walker, because Walker was a reliable employee who was ill, when Walker did not show up for work, Jimmy Walker went to Walker’s house twice to check on him by knocking on the door and looking in a window. Jimmy Walker stated that after getting no response from inside Walker’s house on either visit, Jimmy Walker spoke with Walker’s neighbor, and the police were telephoned. While Jimmy Walker was still at Walker’s house, the police came, *785 entered Walker’s house, and found his body.
Because facts establishing that Walker was sick, frail, and reliable were relevant to establish the events that led to the discovery of the crime and the discovery of Walker’s body, Wilson has not established any error, much less plain error. See Gissendanner, 949 So.2d at 965. Therefore, Wilson is not entitled to any relief on this issue.
To the extent Wilson argues that the State improperly admitted testimony establishing that Walker’s wife had died, that he made a decent salary, and that he would have qualified for retirement, any error was harmless, Rule 45, Ala. R.App. P., and certainly did not rise to the level of plain error. Rule 45A, Ala. R.App. P. In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the Alabama Supreme Court addressed a similar issue and held:
“We agree with Rieber that Mr. Craig’s testimony concerning Ms. Craig’s children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991) ]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber’s attorneys did not object to Mr. Craig’s brief references to Ms. Craig’s children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig’s testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the *786 record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
663 So.2d at 1005-06.
Here, testimony establishing that Walker’s wife had died, that he made a decent salary, and that he would have qualified for retirement was irrelevant to Wilson’s guilt. However, after reviewing the record as a whole, this Court holds that the testimony did not affect the outcome of the trial or otherwise prejudice Wilson’s substantial rights. The testimony was brief and to the point. At most, the testimony established that Walker was not a “human island” but instead had had a family and a job. Id. Further, the trial court properly instructed the jury that it should base its decision on the evidence presented during trial and should not allow “bias or sympathy or prejudice which [it] might have concerning either side” affect that decision. (R. 636.) For the foregoing reasons, Wilson has not shown that this issue rises to the level of plain error; therefore, it does not entitle him to any relief. Rule 45A, Ala. R.App. P.
XII.
Wilson next argues that the circuit court erroneously allowed the State to introduce portions of his statement that contained hearsay and improper “prior bad acts evidence.” (Wilson’s brief, at 59.) Specifically, Wilson argues that the circuit court should have excluded portions of his statement in which: 1) he indicated that he associated with his accomplices; 2) he stated that Corley wanted to go back to the scene and that she said she was thrilled or excited to see Walker’s body; and 3) he stated that Marsh, one of his accomplices, said that Marsh had gotten rid of some of the property that they had stolen from Walker. Wilson did not argue that these portions of the statement constituted inadmissible evidence of prior bad acts; therefore, that issue will be reviewed for plain error only. Rule 45A, Ala. R.Crim. P.
A.
Wilson argues that evidence indicating that he associated with his accomplices, that he and Corley returned to the scene so she could see Walker’s body, and that she was thrilled by seeing the body was improper prior-bad-act evidence. This Court disagrees.
Rule 404(b), Ala. R. Evid., provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
The Alabama Supreme Court “‘has held that the exclusionary rule [contained in Rule 404(b), Ala. R. Evid.,] prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.’ ” Ex *787 parte Belisle, 11 So.3d 323, 334 (Ala.2008) (quoting Ex parte Drinkard, 777 So.2d 295, 302 (Ala.2000) (emphasis added)). However, by its plain language, Rule 404(b) operates to exclude only evidence of “other crimes, wrongs, or acts.” Thus, Rule 404(b) does not require the circuit court to exclude evidence of bad acts that constitute a part of the crime for which the defendant is on trial.
Here, the evidence that Wilson argues should have been excluded under Rule 404(b) as evidence of prior bad acts was actually evidence of the crime for which he was being tried. Because the evidence Wilson argues should have been excluded under Rule 404(b) actually established the facts of the crime for which he was on trial, no error, much less plain error, occurred by its admission. Rule 45A, Ala. R.App. P.
B.
Wilson next argues that the circuit court should have excluded the following statements Wilson made during his confession: 1) that Corley wanted to go to the scene to see Walker’s body and she said she was thrilled by or excited by seeing Walker’s body; and 2) that Marsh said that he had gotten rid of some of Walker’s property. According to Wilson, these portions of Wilson’s statement constituted inadmissible hearsay under Rules 801 and 802, Ala. R. Evid.
It is well settled that “[t]he question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). Further, “‘[hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. “A statement offered for a reason other than to establish the truth of the matter asserted therein is not hearsay.” Deardorff v. State, 6 So.3d 1205, 1216 (Ala.Crim.App.2004) (citing Smith v. State, 795 So.2d 788, 814 (Ala.Crim.App.2000)). Rule 802, Ala. R. Evid., provides that “hearsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.” However, “if a hearsay statement is admissible under an exception to Rule 802, it is admissible as substantive evidence — i.e., ‘to prove the truth of the matter asserted.’ ” M.L.H. v. State, 99 So.3d 911, 914 (Ala.2011) (quoting Rule 801(c), Ala. R. Evid.).
To the extent Wilson argues that the portion of his confession in which he said that Marsh told him that Marsh had gotten rid of some of Walker’s property was inadmissible hearsay, this Court disagrees. During his conversation with investigators, they discussed what happened to Walker’s property, and the following occurred:
Officer: “Where is all that property at?”
Wilson: “Most of it’s there in Matt [Marsh’s,] I don’t know what he did with it cause I left his stuff at his house.”
Officer: “Most of it’s there where?”
Wilson: “At, well we left it all at Matt’s house cause he got, he put it in some boxes. We all was at his house. I was [going to] take four speakers and some amps but I told him I was like naw just leave it at your house. So he said fíne. And then the next day I asked him if he would bring it over to my house and then that night I talked to him he was like he got rid of it. I don’t know where he put it at. He said he hid it somewhere that’s all I know.”
*788 Officer: “Where is the laptop?”
Wilson: “I have no clue — he put it somewhere. And then the next day I saw him [and] asked him where was, where was the TV, that was Tuesday it was yesterday, I asked him where the TV was. He said he got rid of it.”
(C. 531-32.)
Here, Wilson’s statement indicating that Marsh had gotten rid of some of Walker’s property was not offered to prove the truth of the matter asserted, i.e., that Marsh got rid of the property. Instead, the statement was made to the officers and offered to the jury to show why Wilson did not know where the property was located at the time of his interview. Because Wilson’s statement was not offered to prove the truth of the matter asserted, it was not hearsay. Deardorff, 6 So.3d at 1216. Therefore, this issue is without merit.
Next, Wilson argues that the circuit court should have excluded as hearsay the portion of his statement in which he explained that when he and Corley went back to see Walker’s body, Corley said she was excited and “got a little thrilled with it.” (C. 526.) This issue is likewise without merit.
As stated above, “hearsay is not admissible except as provided by these rules.... ” Rule 802, Ala. R. Evid. One exception to the hearsay prohibition is:
“A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily heath), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s will.”
Ex parte Baker, 906 So.2d 277, 283 (Ala.2004) (quoting Rule 803(3), Ala. R. Evid.). Under “Rule 803(3), Ala. R. Evid., ... a statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition is admissible as relevant evidence.” McClain v. State, 26 So.3d 491, 495 (Ala.Crim.App.2009) (citing Charles W. Gamble, McElroy’s Alabama Evidence, 261.03(2) and (5) (5th ed.1996)). Thus, “[a] statement directly or circumstantially indicating the existence in the declarant of an emotion such as love, hatred, fear, malice, mental pain or their opposites, is admissible under the present exception.” Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence, § 261.03(5) (6th ed.2009).
Here, Investigator Luker and Wilson were discussing what happened when Wilson and Corley went back to the crime scene to see Walker’s body. During that conversation, Investigator Luker asked Wilson if Corley called anyone to come and help Walker, and Wilson responded:
“She, she was, she was kind of I don’t know what was her, what her, she seem like she said she got a little thrilled with it or some .... something like that. She said she guess she was excited I don’t [know] what was up with her.”
(C. 526.)
Corley’s statement that she was “thrilled” and “excited” by seeing Walker’s dead body appears to have been a statement of her then “then existing ... state of ... emotion.” Rule 803(3), Ala. R. Evid. In relaying Corley’s expression, Wilson was describing the events that occurred while he and Corley were in Walker’s house. Further, the statement “directly ... indicates] the existence in the declarant of an emotion” — excitement. Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence, § 261.03(5) (6th ed.2009). Therefore, this Court cannot say that the circuit court *789 abused its discretion by failing to exclude this portion of Wilson’s confession.
XIII.
Wilson argues that the circuit court erred by failing to remove for cause jurors who, in his opinion, could not be impartial. Specifically, Wilson argues that prospective jurors T.H., K.L., and S.W. “each expressed during jury selection that their personal experiences with crime and victimization would substantially impair their ability to judge Mr. Wilson’s case objectively.” (Wilson’s brief, at 60.) Because Wilson did not challenge these jurors for cause, this Court reviews this claim for plain error only. Rule 45A, Ala. R.App. P.
“‘To justify a challenge for cause, there must be a proper statutory ground or ‘“some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.’ ” Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This Court has held that “once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions” about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995).... In order to justify disqualification, a juror “ ‘must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused’ “ ‘[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.’ ” Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App.1989)).’
“Ex parte Davis, 718 So.2d 1166, 1171—72 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).”
Whitehead v. State, 777 So.2d 781, 808 (Ala.Crim.App.1999). Wilson’s claims regarding the prospective jurors will be addressed individually.
A.
During voir dire, T.H. stated that his home had been burglarized and vandalized several years earlier. When asked by the circuit court if he felt his experience would affect him in this case, T.H. replied, “I’m not certain I could set it aside.” (R. 167.) The circuit court then asked T.H. if he thought his experience would affect him while he weighed the evidence. T.H. again responded that he was “not certain [he] could set it aside.” (R. 168.) Neither the State nor defense asked T.H. any questions.
T.H. was candid about his experience as a victim, twice stating that he was unsure if he could set aside his experience. Such an honest response merely indicated that T.H. was uncertain, not that he had “ ‘more than a bias, or fixed opinion, as to the guilt or innocence’” of Wilson, and that his opinion was “ ‘so fixed ... that it would bias the verdict [he] would be required to render.’ ” Oryang v. State, 642 So.2d 979, 987 (Ala.Crim.App.1993); see Clark v. State, 443 So.2d 1287, 1289 (Ala.Crim.App.1983) (“A juror who brings. his thoughts out into the open in response to voir dire questions may be the one who later ‘bends over backwards’ to be fair.”); cf. Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996) (trial court’s failure to sua *790 sponte excuse a prospective juror who had indicated that she had “one foot already over” on a verdict of guilt and a sentence of death was not plain error where the defendant allowed the prospective juror to remain as an alternate on the jury). This Court finds no plain error in the circuit court’s failure to remove T.H. for cause from the jury venire.
B.
Wilson next argues that the circuit court should have removed K.L. from the venire. K.L. told the circuit court that his father had been murdered during a robbery when K.L. was 15 years old. The following discussion then took place:
Court: “How do you feel about that? Do you feel you could give the defendant in this case a fair trial?”
K.L.: “Probably so. I have pretty strong convictions, you know, after going through it.”
Court: “But you feel you could be open-minded?”
K.L.: ‘Yes, I think — yes, I believe so.”
[[Image here]]
Defense: “[K.L.], if the facts came out that this was a burglary and a robbery that occurred in Mr. Walker’s house, allegedly committed by my client, would the fact that your father had died in similar circumstances cloud your judgment when you took a look at the facts and circumstances of this case?”
K.L.: “Probably not.”
Defense: “Okay. And again, I appreciate you saying probably not.”
K.L.: “I mean, I don’t think so. But, you know, you asked the question. I want to respond. I don’t want to come back on some kind of appeal and say I was biased because I went through the same thing when I was 15 years old.”
Defense: “Could it affect your decision, what happened in the past?”
K.L.: “I don’t think so.”
(R. 168-70.)
As the record makes clear, K.L. stated that he believed he could give Wilson a fair trial and that he could remain open-minded. “It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court.” Whitehead, 777 So.2d at 810 (citations and quotations omitted). Wilson, however, argues that K.L.’s “primary objective in voir dire was to dispel the appearance of bias, rather than to be forthright about his potential bias.” (Wilson’s brief, at 63.) Nothing in the record supports Wilson’s assertion. Consequently, this Court finds no error, much less plain error, in the circuit court’s failure to remove K.L. for cause from the jury veni-re.
C.
Wilson next argues that the circuit court should have removed S.W. from the venire. S.W. stated that she had been a victim of a burglary and assault and that her attacker had “left [her] for dead in the yard.” (R. 156.) S.W. initially told the circuit court that she was unsure if she could give Wilson a fair trial. After defense counsel explained to S.W. what he expected the evidence to show, S.W. stated that she did not believe she could give Wilson a fair trial.
Assuming without deciding that it was error for the circuit court to fail to sua sponte remove S.W. for cause, that error was harmless beyond a reasonable doubt. Rule 45, Ala. R.App. P. “[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a *791 peremptory strike. Bethea v. Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002).” Pace v. State, 904 So.2d 331, 341 (Ala.Crim.App.2003). But see Ex parte Colby, 41 So.3d 1, 7 (Ala.2009) (holding that erroneously denying multiple challenges for cause is not harmless). Here, Wilson used a peremptory strike to remove prospective juror S.W.; therefore, any error was harmless. See Pace, 904 So.2d at 341.
XIV.
Wilson next argues that “[t]he prosecutor inexplicably revealed to the entire [venire] panel the confidential voir dire responses of Jurors R.B. and J.W. concerning their discomfort with the death penalty.” (Wilson’s brief, at 65) (citing R. 94, 102.) According to Wilson, the prosecutor’s improper disclosure of R.B.’s and J.W.’s confidential voir dire responses “signaled to the panel that, if they shared potentially embarrassing information with the court, this information could be aired to the entire panel[ and created] a fear of exposure [that] undoubtedly intimidated potential jurors into being less than forthright.” (Wilson’s brief, at 65-66.) Wilson then accuses the circuit court of “d[oing] nothing” to prevent the prosecutor from sharing with the entire venire “potentially embarrassing information” and argues that “[t]he trial court’s failure to intervene violated [his] right to an impartial jury....” Id. Wilson did not raise this objection at trial; therefore, this Court reviews this issue for plain error only. Rule 45A, Ala. R.App. P.
Initially, this Court notes that Wilson’s entire argument is based on a misreading of the record. The prosecutor did not, as Wilson argues, disclose R.B.’s and J.W.’s confidential voir dire responses. Instead, the record reveals that at the beginning of voir dire, the circuit court asked members of the venire who may have “medical problems” or “judgment problems” to come forward. (R. 26.) At that point, R.B. and J.W. came forward. R.B. informed the court that he was diabetic and that he had to eat every two hours. (R. 27.) He also informed the court that “on the moral side, I don’t believe in ... capital punishment.” (R. 27.) The court informed R.B. that it would “specifically ask about that in a few moments[, and Juror R.B. responded,] Okay.” (R. 27.) A few moments later, J.W. approached the bench and informed the court that she takes medication that makes her sleepy. (R. 31.) She also informed the court that she is a minister and could not impose the death penalty.
After the circuit court heard potential jurors’ medical problems, it began questioning the venire as a whole. The circuit court began by asking the venire whether there were any members who could not recommend a sentence of life in prison without the possibility of parole and whether there were any members who could not recommend a sentence of death. (R. 43.) Both R.B. and J.W. raised their hands. (R. 44.) The circuit court then continued to ask the jury general qualifying questions.
Once the circuit court finished its questions, it allowed the parties to question the venire. During this period, the prosecutor questioned a number of potential jurors regarding whether they could recommend a sentence of death and specifically asked whether there was anyone that “just do[es] [not] believe in the death penalty.” (R. 93-104.) While questioning the venire about their belief in or opposition to the death penalty, the prosecutor thanked R.B. and J.W. for their honesty and said that he respected them for their positions. Specifically, the prosecutor told R.B., “[R.B.], I appreciate your honesty. You indicated that you have a fixed opinion against the death penalty. I respect you *792 for that. You came up and told us. I appreciate your honesty.” (R. 94.) The prosecutor then made the following statement to J.W.: “Reverend [J.W.], I appreciate your honesty. And your response was — and you told us, honestly, I cannot [recommend a sentence of death] because of my religion.... I respect you for that. And I appreciate your honesty.” (R. 102.)
Contrary to Wilson’s assertions, “[t]he prosecutor [did not] reveal[] to the entire [venire] panel the confidential voir dire responses of Jurors R.B. and J.W. concerning their discomfort with the death penalty.” (Wilson’s brief, at 65.) Rather, R.B. and J.W. volunteered that information when the Court asked the entire veni-re whether there was anyone who could not recommend a sentence of life in prison without the possibility of parole or a sentence of death. Further, the prosecutor did not create a “fear[ ] of exposure [that] undoubtedly intimidated potential jurors into being less than forthright.” (Wilson’s brief, at 65-66.) Instead, the prosecutor thanked R.B. and J.W. for their honesty and told them that he respected them for their positions. Accordingly, Wilson’s argument is not supported by the record.
Further, nothing in the record supports Wilson’s blanket assertion that fear of exposure “intimidated potential jurors into being less than forthright,” thus, “violating] [his] right to an impartial jury....” (Wilson’s brief, at 65-66.) Instead, it appears that during voir dire, potential jurors answered the parties’ questions freely. In any event, because Wilson has not directed this Court to any support in the record for his assertion that potential jurors feared disclosure of information and thus were “less than forthright,” this issue does not entitle Wilson to any relief. See Burgess v. State, 723 So.2d 742, 757 (Ala.Crim.App.1997) (holding that this Court “will not hold a trial court in error based on the bare, unsupported speculations asserted in an appellant’s brief’); Pressley v. State, 770 So.2d 115, 123 (Ala.Crim.App.1999) (same).
Finally, “[i]n a capital case, the conduct of the voir dire examination of the jury venire is a matter within the discretion of the trial court.” Taylor v. State, 808 So.2d 1148, 1184 (Ala.Crim.App.2000) (citing Bell v. State, 475 So.2d 601 (Ala.Crim.App.1984)). Likewise, “[a]s a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court.” Walker v. State, 932 So.2d 140, 156 (Ala.Crim.App.2004) (quoting Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), citing in turn, Waldrop v. State, 462 So.2d 1021, 1025 (Ala.Crim.App.1984)). Here, Wilson has not shown the that circuit court abused its discretion, much less committed plain error, by allowing the prosecutor to question the venire as a whole regarding potential jurors’ feelings about the death penalty. Rule 45A, Ala. R.App. P. Therefore, Wilson is not entitled to any relief on this issue.
XV.
Wilson next argues that the circuit court erroneously allowed the State to elicit testimony in the guilt phase establishing that Walker felt pain while being murdered. Specifically, Wilson argues that the State improperly elicited testimony from Dr. Enstice showing that Walker felt pain when his bones were broken and when he received other injuries during the attack that resulted in his death. According to Wilson, “the pain Mr. Walker may have felt, though potentially relevant in sentencing, was entirely irrelevant to the question of Mr. Wilson’s guilty or innocence.” (Wilson’s brief, at 67.) Wilson did not object to Dr. Enstice’s testimony at trial; therefore, this Court reviews these *793 arguments for plain error only. (R. 498-99); Rule 45A, Ala. R.App. P.
As discussed in Part VII, this Court has held that “[t]he pain and suffering of the victim is a circumstance surrounding the murder — a circumstance that is relevant and admissible during the guilt phase of a capital trial.” McCray v. State, 88 So.3d 1, 38 (Ala.Crim.App.2010) (citing Smith v. State, 795 So.2d 788, 812 (Ala.Crim.App.2000) (no error in trial court’s questioning witness regarding the number of wounds on the murder victim’s body during guilt phase of capital-murder trial despite appellant’s argument that the number of wounds was relevant only to the penalty-phase issue whether the murder was especially heinous, atrocious, or cruel)). Furthermore, the State’s theory of the case was that Wilson broke into Walker’s house, attacked him, and tortured him in an attempt to force Walker to relinquish his property. Because the pain Wilson caused Walker was relevant and admissible to show the force Wilson used against Walker during the robbery, Dr. Enstice’s testimony relating to the pain Walker suffered did not constitute error.
Moreover, even if Dr. Enstice’s testimony regarding Walker’s pain were irrelevant, any error in its admission was harmless. It is well settled that “ ‘[t]estimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.’” Gobble v. State, 104 So.3d 920, 959 (Ala.Crim.App.2010) (quoting Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993)). Addressing a similar issue in which victim-impact evidence was improperly admitted during the guilt phase of a capital-murder trial, the Alabama Supreme Court explained:
“We agree with Rieber that Mr. Craig’s testimony concerning Ms. Craig’s children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991)]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber’s attorneys did not object to Mr. Craig’s brief references to Ms. Craig’s children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had *794 established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig’s testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
Ex parte Rieber, 663 So.2d 999, 1005-06 (Ala.1995).
Here, the State properly admitted evidence from which the jurors must have concluded that Walker suffered a painful death. The State’s evidence established that Walker was beaten with a baseball bat, strangled with a computer-mouse cord until that cord snapped, and then strangled with an extension cord. The State also admitted evidence that established that, during the attack, Walker received, among others, the following injuries: 1) multiple fractures to the skull; 2) eight broken ribs; 3) a fractured sternum; 4) ligature marks on his neck; and 5) a contusion on his lung. From this evidence, the jurors, who did “not leave their common sense at the courthouse door,” must have known that Walker suffered a painful death. Id. Additionally, like the jurors in Rieber, the jurors were thoroughly instructed regarding the State’s burden to establish Wilson’s guilt. The jurors were also instructed not to allow sympathy or prejudice to influence their decision.
As the Supreme Court stated in Rieber, “[i]t would elevate form over substance for [this Court] to hold, based on the record before us, that [Wilson] did not receive a fair trial simply because the jurors were told what they probably had already [knew]” — that Walker suffered during his murder. Id. Based on this properly admitted evidence relating to the attack and injuries and the circuit court’s guilt-phase jury instructions, this Court holds that error, if any, in the admission of Dr. Ens-tice’s testimony was harmless and did not rise to the level of plain error. Rule 45A, Ala. R.Crim. P. Therefore, this issue does not entitle Wilson to any relief.
XVI.
Wilson next argues that the circuit court erred by allowing Dr. Enstice to make irrelevant and prejudicial comparisons of Walker’s injuries to injuries in other cases. Specifically, Wilson cites the following testimony:
State: “Of all the human beings you have done autopsies on, how many human beings have you seen like Mr. Walker and those type injuries?”
Defense: “Objection, Your Honor. This is a capital murder case, which is individual not only to the defen *795 dant in the case, but also to the victim in the case. It is not to be compared with other people’s injuries that she has seen.”
Court: “Ground — is it 8 or 13?”
State: “13,1 believe it is.”
Court: “Overruled.”
State: “You can tell us, in your opinion.”
Witness: “I have seen a large number of cases where some — a person or a victim was deceased due to multiple different types of injuries, including strangulation, blunt force injuries, all in the setting of decomposition, as well. To put a number on it, dozens and dozens. Again, I don’t know that I can clarify that much better for you, but many, many times.”
State: “Okay. The number of injuries, in other words, that he has compared to the others, is this larger or smaller, I guess is what I’m asking?”
Witness: “These are — this is definitely a very large number of injuries. And I have seen several other cases and actually performed autopsies on cases where there were large numbers of injuries. And this is — Mr. Walker certainly had a very large number of injuries that cannot be accounted for by an accidental manner of death.”
(R. 530-31.)
Based on the foregoing, Wilson argues that Dr. Enstice’s testimony was irrelevant and prejudicial because she failed to specify whether the other cases to which she was comparing Wilson’s case involved intentional killings and that the purpose of the testimony was to distract the jury by focusing on the severity of the attack and the pain suffered by the victim.
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid. “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.” Rule 402, Ala. R. Evid. “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Rule 403, Ala. R. Evid.
“‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).”
Brown v. State, 56 So.3d 729, 735 (Ala.Crim.App.2009).
As discussed in Part VII of this opinion, the State’s theory of the case was that Wilson broke into Walker’s house, attacked him, and tortured him in an attempt to force Walker to relinquish his property. Here, Dr. Enstice’s testimony regarding the number of injuries Wilson inflicted on Walker was relevant to establish the State’s theory. Further, in his statement to the police, Wilson maintained that he accidentally hit Walker in the back of the head with a baseball bat during an attempt to strike Walker in the shoulder and that he wrapped a computer-mouse cord around Walker’s neck, but not so *796 tightly that it would hurt Walker. In light of the State’s theory of the case and Wilson’s statements, the testimony of Dr. Enstice was highly relevant because her testimony as to the number of injuries sustained by Walker supported the State’s theory and directly refuted Wilson’s account of Walker’s death. Dr. Enstice’s comparison to other autopsies she had performed was also relevant because it gave the jury context for her answer about the number of injuries sustained by Walker.
Given the liberal test applied to determine the relevancy of evidence, this Court cannot say that the circuit court abused its discretion in allowing Dr. Enstice’s testimony. Therefore, this issue does not entitle Wilson to relief.
XVII.
Wilson next argues that the circuit court erred by admitting crime-scene photographs, autopsy photographs, and a video of the crime scene. Specifically, Wilson contends that this evidence served “little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,” and that the “true purpose of [this evidence] was to, shock the jurors into voting for a conviction and death sentence.” (Wilson’s brief, at 68-69.) Wilson filed a motion in limine to preclude the State from admitting into evidence any gruesome and prejudicial photographs. (C. 188-91.) The circuit court denied Wilson’s motion without an explanation. (C. 319.)
Alabama courts have long recognized that photographs depicting the crime scene and the wounds of the victims are relevant and admissible. See Stallworth v. State, 868 So.2d 1128, 1151 (Ala.Crim.App.2001) (quoting Land v. State, 678 So.2d 201, 207 (Ala.Crim.App.1995)) (“The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim’s wounds are admissible despite the fact that they may be gruesome or cumulative.”); Ward v. State, 814 So.2d 899, 906 (Ala.Crim.App.2000) (quoting Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989)) (“The same rule applies to videotapes [that applies to] photographs-”). In Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007), this Court explained:
“ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” ’ Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.’ Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[A]utopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed *797 matter.” ’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002).”
This Court has reviewed the crime-scene photographs, autopsy photographs, and the crime-scene video, and holds that they were relevant and admissible to show the scene of the crime and the extent of the victim’s injuries. The photographs and video depicting the extent of Walker’s injuries were particularly relevant given the State’s theory that Wilson tortured Walker during the robbery and Wilson’s claim that he struck Walker only once with the baseball bat. Further, although unpleasant, the photographs were not unduly gruesome. Therefore, the circuit court did not commit any error in allowing the photographs and video to be admitted at trial.
XVIII.
Wilson next argues that the circuit court erred by giving erroneous and prejudicial penalty-phase instructions. Specifically, he argues that the circuit court erred by: a) allowing the jury to believe it could not consider mercy; b) leading the jury to believe it could not consider a mitigating circumstance unless the entire jury agreed upon the existence of the mitigating circumstance; and c) diminishing the jury’s role in the penalty phase. Wilson also appears to argue that the alleged errors in the circuit court’s penalty-phase instructions constituted cumulative error. Wilson did not object to these instructions; therefore, these instructions will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
A.
Wilson argues that the circuit court erroneously allowed the jury to believe it could not consider mercy when it stated that the jury “should avoid any influence of passion, prejudice or any other arbitrary factor.” (R. 808.)
This argument has been addressed and rejected by this Court, and the circuit court’s instructions on passion and prejudice have been upheld as proper. See Vanpelt v. State, 74 So.3d 32, 93 (Ala.Crim.App.2009); Barber v. State, 952 So.2d 393, 450-53 (Ala.Crim.App.2005); Whisenhant v. State, 482 So.2d 1225, 1235-36 (Ala.Crim.App.1982); see also Jefferson v. State, 473 So.2d 1100, 1103 (Ala.Crim.App.1984) (failure to instruct jury to avoid any influence of passion, prejudice or other arbitrary factor required remand for new sentencing hearing). Wilson has not offered the Court any compelling reason to revisit theses cases. Therefore, he has not shown that the circuit court’s instruction was erroneous and is not entitled to relief on this claim.
B.
Next, Wilson argues that the circuit court erred by leading the jury to believe it could not consider a mitigating factor unless the entire jury agreed upon its existence. Wilson does not assert that the jury was improperly instructed that it could not consider a mitigating factor unless the entire jury agreed upon its existence; rather, he argues that the circuit court led the jury to believe it had to be unanimous because the circuit court failed to instruct the jury otherwise.
“As we stated in Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000):
“ ‘The appellate courts of this state have consistently held, since the United States Supreme Court’s decision in *798 Mills [v. Maryland, 486 U.S. 367 (1988)], that as long as there'is no “reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances,” there is no error in the trial court’s instruction on mitigating circumstances. Freeman [v. State], 776 So.2d [160] at 195 [ (Ala.Crim.App.1999) ]. See also Ex parte Martin, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).’
“784 So.2d at 351.”
Calhoun v. State, 932 So.2d 923, 972 (Ala.Crim.App.2005).
Wilson has failed to cite any authority to support his argument that the circuit court is required to affirmatively instruct the jury that it need not be unanimous in finding mitigation. Moreover, during its penalty-phase instructions, the circuit court stated:
“So in order to find an aggravating circumstance, you must find it unanimously, beyond a reasonable doubt. A mitigating circumstance merely has to be raised for you to consider it. And the — any dispute on a mitigating circumstance has to be disproved by the State by a preponderance of the evidence.”
(R. 814.)
This Court has reviewed the circuit court’s instructions on mitigating circumstances and holds that there is no “reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances.” Calhoun, 932 So.2d at 972. Therefore, there was no error in the circuit court’s instructions. Accordingly, this issue does not entitle Wilson to any relief.
C.
Finally, Wilson argues that the circuit court erred by diminishing the jury’s role in the penalty phase when it stated: “And in the sentencing phase, the procedure is generally the same as in the guilt phase, except the sentencing phase is not near as involved.” (R. 690.)
Taken in context, the circuit court was merely informing the jury that the penalty phase would not be as lengthy as the guilt phase. This statement did not, as Wilson suggests, diminish the jury’s role in a way that made it feel less responsible than it should for sentencing. There was no error, plain or otherwise, in the circuit court’s instruction. Therefore, this issue does not entitle Wilson to any relief.
D.
To the extent Wilson argues that cumulative errors in the circuit court’s instructions require reversal, this Court disagrees.
“The correct rule is that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have ‘probably injuriously affected substantial rights of the *799 parties,’ then the cumulative effect of the errors may require reversal.”
Ex parte Johnson, 820 So.2d 883, 885 (Ala.2001).
Wilson has failed to show any error in the circuit court’s instructions; thus, he has failed to show that a cumulative effect of those errors require reversal. Therefore, this issue does not entitle Wilson to any relief.
XIX.
Wilson next argues that the circuit court erred by sentencing him to death without first obtaining an adequate presentence-investigation report. Specifically, Wilson argues that the presentence-investigation report was of minimal value because it did not refer to a previously completed competency exam or youthful-offender investigation, nor did it contain notes from the evaluator.
The record does not show that Wilson objected to the contents of the presen-tence-investigation report. Accordingly, this Court reviews this issue for plain error. See Rule 45A, Ala. R.App. P.
In support of his argument, Wilson relies on Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), in which this Court reversed Guthrie’s sentence based on an insufficient presentence-investigation report. Specifically, this Court took issue with the lack of recent information in Guthrie’s personal- and social-history section of the report, and its lack of any information in Guthrie’s evaluation-of-offender section. In Guthrie, this Court held:
“This presentence report’s cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court’s consideration of the full mosaic of Guthrie’s background and circumstances before determining the proper sentence. As such, this pre-sentence report risked foiling the purpose of § 13A — 5—47(b)[, Ala.Code 1975]. We find that the insufficiency of this report requires a remand for the trial court to reconsider Guthrie’s sentence with a sufficient presentence report.”
689 So.2d at 948.
In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), this Court distinguished Guthrie, stating:
“In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie’s sentence and remanded the case for the trial court ‘to reconsider Guthrie’s sentence with a sufficient presentence report.’ 689 So.2d at 947. ...
[[Image here]]
“... ‘The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury’s advisory verdict is proper and if not, what the appropriate sentence should be.’ Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
“Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the ‘full mosaic of [Jackson’s] background and circumstances’ before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie’s personal and social history contained in the report had been taken *800 from an interview that was conducted at least five years before his sentencing hearing and no attempt had been made to update that information for purposes of the presentence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
“Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson’s trial, and, like the report in Guthrie, indicated that no psychological reports were on file when, in fact, Jackson had been evaluated both at the Taylor Hardin Secure Medical Facility approximately six months before trial and by his own expert only a week before trial, we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
“In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here,, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goffs and Dr. Smith’s psychological evaluations containing extensive information about Jackson’s life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not ‘hamstrung’ into determining Jackson’s sentence without consideration of ‘the full mosaic’ of Jackson’s background and circumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999). Therefore, we find no error, plain or otherwise, as to this claim.”
791 So.2d at 1033-34. See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000).
As in Jackson, the circuit court here was presented with “the full mosaic” of Wilson’s background and circumstances. During the penalty phase, Wilson presented testimony from his mother, who testified at length about Wilson’s childhood, and from a childhood neighbor, who testified about Wilson’s willingness to aid her in her capacity as a disaster-relief worker. See Ex parte Washington, 106 So.2d 441, 450 (Ala.2011) (expressly refusing to hold that “the adequacy of the presentence report should be evaluated in isolation”). In addition, the reports that Wilson complains should have been part of the presentence-investigation report — the competency-exam report and the youthful-offender-investigation report — were, in fact, part of the circuit court’s file and are part of the record on appeal. (C. 29, 47-53; 1st Supp. C. 18-24.)
Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presen-tence-investigation report, this Court holds that any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P.; Sharifi v. State, 993 So.2d 907, 941-49 (Ala.Crim.App.2008) (concluding there was “no plain error in the incomplete presen-tence report as it is clear that the circuit court had access to the omitted information”). Accordingly, this issue does not entitle Wilson to any relief.
XX.
Wilson next argues that the circuit court erred by denying his application *801 for youthful-offender status.[15] Specifically, Wilson asserts that the circuit court “accepted without independent analysis” the probation officer’s youthful-offender investigation, ignored Wilson’s assertions of why youthful-offender status was appropriate, and made a eonclusory statement that Wilson’s crime was “not very youthful.” (Wilson’s brief, at 76-77.)
“In Duke v. State, 889 So.2d 1, 17 (Ala.Crim.App.2002), we stated:
“ ‘ “In determining whether to treat a defendant as a youthful offender, the trial court has nearly absolute discretion. Morgan v. State, 368 So.2d 1013 (Ala.Crim.App.1978); see, also, Ex parte Farrell, 591 So.2d 444, 449-50, n. 3 (Ala.1991). There is no set method for considering a motion requesting such treatment. Edwards v. State, 294 Ala. 358, 317 So.2d 512 (1975). However, the Youthful Offender Act, § 15-19-1, Ala.Code 1975, requires that the court conduct a factual investigation into the defendant’s background. Ware v. State, 432 So.2d 555 (Ala.Crim.App.1983). Generally, the trial court considers the nature of the crime charged, any prior convictions, the defendant’s age, and any other matters deemed relevant by the court. Clemmons v. State, 294 Ala. 746, 321 So.2d 238 (1975). Moreover, the trial court need not articulate on the record its reasons for denying the defendant youthful offender status. Garrett v. State, 440 So.2d 1151, 1152-53 (Ala.Crim.App.1983), cert. denied (Ala.1983). Accord, Goolsby v. State, 492 So.2d 635 (Ala.Crim.App.1986).” ’
“ ‘Reese v. State, 677 So.2d 1239, 1240 (Ala.Crim.App.1995).’
“ When deciding whether to grant youthful offender status, it is expected that the nature of the crime charged, along with prior convictions of the defendant, will be considered, as well as any other matters deemed relevant by the court.’ Goolsby v. State, 492 So.2d 635, 636 (Ala.Crim.App.1986). ‘The Youthful Offender Act vests in the trial judge almost absolute discretion to grant or deny youthful offender status after making an appropriate investigation.’ Morgan v. State, 363 So.2d 1013, 1015 (Ala.Crim.App.1978).”
Flowers v. State, 922 So.2d 938, 944-45 (Ala.Crim.App.2005).
Parole Officer Chris Robertson’s youthful-offender report included the details of the offense and indicated that Wilson had been engaged to be married, that he had completed high school, and that he had been employed. It was Officer Robertson’s opinion that Wilson should not receive youthful-offender status in this case. (C. 47-53.)
At the youthful-offender hearing, the circuit court stated:
“I am going to deny youthful offender treatment. It’s not only this aspect of living as an adult, but the — you cannot deny youthful offender for the nature of the crime, just because it’s capital murder. But the way the thing was carried out and the cold-bloodedness later — this group of people just going back and stealing things, just like it is routine, leaving the man there just dead in his home is not very youthful. This man acted — he may be living as an adult, but he sure acted as an adult in the days following this crime. So youthful offender is denied.”
(Supp. R. 6-7.)
Based on Officer Robertson’s report and the circuit court’s stated findings, there is no indication that the circuit court abused *802 its broad discretion in denying Wilson’s application for youthful-offender status. See Ex parte Farrell, 591 So.2d 444, 449 (Ala.1991) (“[W]e hold that the nature of the fact situation on which a charge is based may, alone, be a sufficient reason for denying youthful offender status.”). Therefore, this issue does not entitle Wilson to any relief.
XXI.
Wilson next argues that his sentence of death must be vacated in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and state and federal law. He further argues that the Supreme Court of the United States’ decision in Ring invalidated Alabama’s capital-sentencing scheme.
In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases the maximum punishment must be presented to a jury and proven beyond a reasonable doubt. This holding was extended to death-penalty cases in Ring v. Arizona.
Here, the jury specifically found beyond a reasonable doubt that the capital offense was committed while Wilson was committing the offenses of burglary and robbery. See § 13A-5-49(4), Ala.Code 1975. The finding of these aggravating circumstances made Wilson eligible to receive the death penalty. Therefore, the requirements of Ring were satisfied. See also Annot., Application of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) to State Death Penalty Proceedings, 110 A.L.R.5th 1 (2003).
Wilson’s argument that Ring invalidated Alabama’s capital-sentencing scheme is also without merit. In Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court held:
“[W]hen a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 13A-5-45(e)....
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala. Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a - sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring [v. Arizona], 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443 [ (2002) ]. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi [v. New Jersey, 530 U.S. 466 (2000),] require.”
859 So.2d at 1188 (footnote omitted). The Alabama Supreme Court reaffirmed its holding in Ex parte Waldrop in Ex parte Martin, 931 So.2d 759, 770 (Ala.2004).
Here, as in Waldrop, the jury, not the circuit court, determined beyond a reasonable doubt that aggravating circumstances existed. Therefore, the requirements of *803 Ring were satisfied. Accordingly, this issue does not entitle Wilson to relief.
XXII.
Wilson next argues that the circuit court erred by failing to give his requested charge of the lesser-included offense of murder. Wilson argues that the jury could have reasonably concluded that the murder was distinct from the burglary and robbery. Wilson does not assert from which facts the jury could have reasonably made such a determination.
“A capital murder defendant is entitled to a charge on a lesser included offense only where there is a reasonable theory from the evidence that would support such a charge.” Ex parte Trawick, 698 So.2d 162, 177 (Ala.1997) (citing Anderson v. State, 507 So.2d 580 (Ala.Cr. App.1987)). At trial, however, Wilson failed to present any evidence that would support a charge on noncapital murder, and the State’s evidence did not support such a charge.
According to Wilson’s statement, his purpose for entering Walker’s house was to take Walker’s laptop, and, once he was inside, Marsh telephoned him and told Wilson to “see what else he could find.” (R. 520.) It was during this search that Walker arrived home and was murdered by Wilson. Wilson told the police that he left with the laptop after his assault on Walker. “No reasonable interpretation of the evidence contained in the record would contradict [Wilson]’s confession and support an inference that [his murder of Walker was distinct from the burglary].” Trawick, 698 So.2d at 177. Accordingly, the circuit court did not err in refusing to give Wilson’s requested charge of noncapi-tal murder. Therefore, this issue does not entitle Wilson to any relief.
XXIII.
Wilson next argues that the circuit court erred by allowing unqualified expert testimony regarding blood-spatter evidence. Specifically, Wilson asserts that Investigator Luker “was able to testify on such matters as low-velocity versus high-velocity blood splatter [sic] and the implications of blood ‘pooling,’ blood ‘trailing,’ and blood droplets.” (Wilson’s brief, at 84.) Wilson did not object to Investigator Luker’s testimony on this ground; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. RApp. P.
Investigator Luker gave the following testimony regarding the presence of blood at the scene:
State: “Now, could you tell the ladies and gentlemen of the jury the position Mr. Walker was in—did you see any substances around his body?”
Witness: “Yes, sir, I did.”
State: “What color? ... Tell the panel, if you could, please, ... what color substance you saw around his body.”
Witness: “Red.”
State: “Now, did you see a small amount or a large amount?”
Witness: “A large amount.”
State: “Now, did you inspect the house looking for any other evidence?”
Witness: ‘Tes, sir.”
State: “Could you make a determination if there were any other areas that had red substances—different in position of the body he was exactly in—connected to his body or coming from his body?”
Witness: ‘Tes, sir.”
State: “How could you do that?”
Witness: “Looking at the blood droplets—”
State: “What’s a blood droplet? Describe what we are talking about.
*804 Are we talking about the size of a pinhead or bigger?”
Witness: “No, sir. They were bigger. Looking at the blood, you know, you can tell if it’s a drop — straight down, you have got high velocity, low velocity, blood splatter, you know, the pools — the pools of blood where the body was where it seeped out of the body forming a pool. But, then, there were several other blood droplets or drops around throughout the house.”
State: “Okay. That’s what I want you to tell the jury. You described the bloody pool or the pool of blood that was coming from his body. In other words, were there breaks in that, generally, or was it all connected where it had run on either side of his skull?”
Witness: “There was blood on either side. But, then, there was other areas that were not connected to — to that.”
State: “That’s what I want to ask you about. Any doubt in your mind, tell the jury — in other words, it could have run down there to the other areas — would you have been able to tell it?”
Witness: ‘Yes, sir.”
State: “How could you tell that?”
Witness: “Good common sense would tell you if it is going to run that way, you are going to have a trail of blood to that spot. If there was a vacant place in between the pools of blood, then it didn’t run.”
State: “Okay. Now, tell the ladies and gentlemen of the jury, what other parts of the house do you recall where you found any red substance, any blood, besides where the body was? In other words, the pool by his head?”
Witness: “Away from the body, there in the kitchen, I guess, living room area, whatever you want to call it, away from the body up to the wall, the corner of the wall, there was a pool of blood there with blood droplets there. Also, in the living room area, all the way down the long hallway of the residence was blood droplets, also.”
(R. 262-65.)
This Court has held:
“In general, blood-spatter analysis is the process of examining the size, location, and configuration of bloodstains at a crime scene and using the general characteristics of blood to determine the direction, angle, and speed of the blood before it impacts on a surface in order to recreate the circumstances of the crime. See generally Danny R. Veilleux, Annotation, Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as to ‘Blood Sp[l]atter’ Interpretation, 9 A.L.R.5th 869 (1998), and the cases cited therein. Blood-spatter analysis is typically used to determine the position of the victim and the assailant at the time of a crime.”
Gavin v. State, 891 So.2d 907, 969 (Ala.Crim.App.2003).
Here, Investigator Luker did not analyze the blood spatter to determine the positions of Walker and Wilson at the time of the crime. Rather, his testimony related to his identification of blood at the scene and his common-sense observation that there would be some indication if blood had flowed from one area of the scene to another. Thus, Investigator Luker did not offer expert scientific testimony, and the State was not required to establish his qualifications as an expert in blood-spatter analysis. See Leonard v. State, 551 So.2d 1143, 1146 (Ala.Crim.App.1989) (reaffirmance that lay witnesses may identify a substance as blood); Gavin, 891 So.2d at 967-70 (holding that it was not error to allow lay testimony that “the *805 blood flow coming from the body ran away from the area of the seat that [defendant] would have been seated in”). Accordingly, this issue does not entitle Wilson to any relief.
XXIV.
Wilson next argues that the circuit court erred by instructing the jury that intentional murder during a second-degree burglary was capital murder but failing to provide the jury with the elements for second-degree burglary. According to Wilson, by informing the jury that murder during a second-degree burglary constitutes capital murder and by failing to instruct the jury on the elements of second-degree burglary, the circuit court lowered the State’s burden of proof. Because Wilson did not object on this issue, it will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
This Court has reviewed the circuit court’s instructions and holds that Wilson’s argument is without merit. The circuit court informed the jury that Wilson was charged with capital murder for an intentional murder committed during a first-degree burglary. The Court then noted that under the law an intentional murder during a second-degree burglary would also be capital murder. Thereafter, the circuit court instructed the jury that to find Wilson guilty of capital murder during a burglary, it must find that the murder occurred during a first-degree burglary. Specifically, the circuit court instructed the jury on the element of the capital offense of murder during a first-degree burglary as follows:
“[T]o convict, the State must prove beyond a reasonable doubt each of the following elements. Number one, that Dewey Walker is deceased. Number two, that David Wilson caused the death of Dewey Walker by hitting him with a baseball bat and/or strangling him with the mouse cord or the extension cord. Number three, that in committing the acts which caused the death of Dewey Walker, that Mr. Wilson intended to kill Mr. Walker. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific. The fourth element is that the defendant knowingly and unlawfully entered or remained unlawfully in the dwelling of Dewey Walker. And number five, that in doing so, that he acted with the intent to commit a crime, and in this case, the crime of theft. Number six, that while in the dwelling or in the effecting entry thereto or in the immediate flight therefrom, the defendant caused physical injury to Mr. Walker, and that Mr. Walker was not a participant in the crime. Number seven, that the murder took place during the burglary. In other words, not that the murder happened one day, and the burglary happened some time else next week or vice-versa. The murder takes place during the burglary or — the word ‘during’ encompasses the surrounding times about the burglary.”
(R. at 639-40); see § 13A-7-5, Ala.Code 1975 (defining first-degree burglary as follows: “A person commits the crime of burglary in the first degree if he or she knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, the person or another participant in the crime ... [c]auses physical injury to any person who is not a participant in the crime”).
Here, the circuit court instructed the jury that to find Wilson guilty of the capital offense of murder during a burglary, it had to find that he committed first-degree burglary. Therefore, the circuit court’s *806 failure to instruct the jury on capital murder during a second-degree burglary did not, as Wilson argues, lessen the State’s burden of proof.
Because Wilson’s argument that the circuit court lessened the State’s burden of proof is refuted by the trial record, it is without merit and does not rise to the level of plain error. Rule 45A, Ala. R.App. P.; McNabb v. State, 991 So.2d 313, 320 (Ala.Crim.App.2007) (holding that a claim that is refuted by the record is without merit and does not entitle the appellant to relief). Therefore, Wilson is not entitled to any relief on this issue.
■ XXV.
Wilson next argues that the circuit court erred by failing to instruct the jury on every element of the lesser offense of felony murder committed during a robbery and first-degree burglary, thereby lessening the State’s burden of proof.[16] Wilson did not object to the circuit court’s charges; therefore, this claim will be reviewed for plain error only.
“ When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000) (citing Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999)).
“ ‘A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.CrApp.1992).’
“Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).
“Moreover,
“ ‘ “In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” ’
“Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000) (quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998)).”
Albarran v. State, 96 So.3d 131, 186 (Ala.Crim.App.2011).
A.
A person commits felony murder during the course of a robbery if:
“He or she commits or attempts to commit ... robbery in any degree ... and, in the course of and in furtherance of the [robbery] that he or she is committing or attempting to commit, or in immediate flight therefrom, he or she, or *807 another participant if there be any, causes the death of any person.”
§ 13A-6-2(a)(3), Ala.Code 1975.
The jury was charged as follows on felony murder:
“So I am going to give you the elements of felony murder. A person commits the crime of felony murder if he commits or attempts to commit a burglary in the first or second degree and he causes the death of another person. So to convict, the State must prove beyond a reasonable doubt — to convict of felony murder — must prove beyond a reasonable doubt each of the following elements of murder: Number one, that Dewey Walker is deceased. It is these same elements again, that Mr. Wilson caused his death by beating him with a baseball bat and/or strangling him with the mouse cord or extension cord, and that, in committing that act which caused Mr. Walker’s death, that Mr. Wilson was acting in the course of or in the furtherance of the crime of burglary in the first degree or the second degree. And I have described to you a little earlier in a previous charge the elements of burglary. Number four, that in doing the acts which constituted the commission of the burglary, during the course of which the death of Mr. Walker was caused, that he so caused his death.”
(R. 641-42.) The circuit court then instructed the jury on the elements of first-degree robbery:
“Now, a person commits a robbery in the first degree if, in the course of committing or attempting to commit a theft, he uses force against a person of the owner with the intent to overcome his physical resistance or physical power of resistance or threatens the imminent use of force against the person of the owner with the intent to compel acquiescence to the taking or the escaping with the property, and in doing so, causes serious physical injury to another.”
(R. 644.) Transitioning from its instructions on capital murder, the circuit court stated:
“I am not going to go over all those same definitions that I did before. ' But they all apply the same way, knowingly and intentionally and physical injury and during and all of those same definitions regarding the capital murder burglary apply to capital murder robbery.
“After weighing all of the evidence in the case in regard to the capital murder during the robbery, if you are not convinced beyond a reasonable doubt that Mr. Wilson is guilty of that charge, then you would consider the lesser-included offense of felony murder involving the robbery. And if not, then the lesser-included offense of just plain robbery.”
(R. 646.) Aso, the circuit court instructed the jury:
“Now there’s also the lesser-included offense in the robbery series of felony murder. And concerning that lesser-included, a person commits the crime of felony murder if he commits a robbery in the first degree, and while he is doing so — or during the robbery, he causes the death of any person.”
(R. 664-65.)
When taken as a whole, the circuit court sufficiently addressed the elements of a felony murder committed during a robbery, and the circuit court did not commit error, plain or otherwise, in its instructions on felony murder. Rule 45A, Aa. R.App. P. Therefore, this issue does not entitle Wilson to any relief.
B.
A person commits the crime of first-degree burglary if:
*808 “[H]e or she knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, the person or another participant in the crime:
[[Image here]]
“(2) Causes physical injury to any person who is not a participant in the crime.... ”
§ 13A-7-5(a), Ala.Code 1975. The circuit court instructed the jury on first-degree burglary as follows:
“A person commits a burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling, and he does so with the intent to commit a crime therein, and while effecting entry or while in the dwelling or in the immediate flight therefrom, he causes physical injury to another person who is not a participant in the crime.”
(R. 638.)
“Of course, I have given you the elements of burglary in the earlier charge. And burglary is that a person knowingly and unlawfully enters or remains unlawfully in the dwelling of another for the purpose of committing a crime. And that alleged crime in this case was theft. And the first degree, that while in the dwelling or effecting entry thereto or immediate flight therefrom, that he caused physical injury to a person not a participant in the crime.”
(R. 642^43.) The record shows that the circuit court properly instructed the jury on the elements of first-degree burglary; thus, the circuit court did not commit error, plain or otherwise, in it instructions on first-degree burglary. Rule 45A, Ala. RApp. P. Therefore, this issue does not entitle Wilson to any relief.
XXVI.
Wilson argues that the circuit court erred by failing to ensure a reliable record of the capital proceedings. Wilson points to two portions of the record that, he argues, indicate that the “reliability of the record in this case has ... been cast in serious doubt.” (Wilson’s brief, at 89.)
Wilson first points to the following portion of the record in which the circuit court was discussing the issue of instructing the jury on manslaughter:
Court: “Anyway, the bottom line is, what I just mentioned is, the issue of not including the manslaughter. And, [defense counsel], what says the defense?”
Defense: “Your Honor, [the prosecutor] and I discussed that in front of the Court. Of course, for the reasons that I articulated to you in your office, we still feel that manslaughter is a legitimate charge under the case. And you heard [the prosecutor] give his reason why it was and why it was not.”
(R. 597-98) (emphasis added.) A transcript of the discussion in the judge’s office referenced above does not appear to be in the record. However, as Wilson requested, the circuit court instructed the jury on the lesser-included offense of manslaughter. (R. 660-61.) Accordingly, any error in failing to transcribe a conversation in which Wilson gave his reasons why a manslaughter instruction was warranted was harmless beyond a reasonable doubt. Rule 45, Ala. R.App. P. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824,17 L.Ed.2d 705 (1967).
Wilson also argues that the following portion of the record from closing arguments suggests additional omissions from the record on appeal:
State: “How much suffering did he go through? How much pain, Dr. Ens-tice, did this victim — did he suffer?”
*809 Defense: “Judge, I am going to object again. He is talking specifically about pain, which is what he talked about before.”
Court: “I will sustain the objection. I think we are going more into the area we referred to.”
(R. 616) (emphasis added.) Wilson argues that, because the record lacks a discussion of the limits to be placed on the State’s arguing the issue of pain, the discussion took place off the record.
However, Wilson’s objection relating to pain appears to refer to his earlier objection to the State’s reference during closing arguments to torture. (R. 614-15.) Wilson’s assertion that the passage above suggests that a portion of the record is missing is not supported by the record. In any event, his objection on the matter was sustained by the circuit court; therefore, any error was harmless. Rule 45, Ala. R.App. P. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Therefore, this issue does not entitle Wilson to any relief.
XXVII.
Wilson next argues that the State’s evidence was insufficient to sustain his conviction for murder made capital because it was committed during the course of a robbery. The underlying offense of first-degree robbery was predicated on Wilson’s theft of Walker’s van. Wilson argues, based on his statement to Investigator Luker, that he entered Walker’s house the day before Walker’s murder and took the keys to the van without using force against Walker; that on the night of the murder, his intent in entering the house was to steal Walker’s laptop; and that he did not attempt to steal the van until the following day. Thus, Wilson argues, there was no logical connection between Walker’s murder and the theft of the van.
“ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998) (quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985)). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997) (quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992)). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.’ ” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998) (quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990)). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040,1042 (Ala.1978).
Further,
“ ‘ “[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.” McCord v. State, 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quot *810 ing Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908).’
“French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
“ ‘ “The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).” Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985).’
“Oryang v. State, 642 So.2d 989, 994 (Ala.Crim.App.1994).”
Renney v. State, 53 So.3d 981, 988 (Ala.Crim.App.2010).
Section 13A-8-41(a), Ala.Code 1975, provides:
“A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
“(1) Is armed with a deadly weapon or dangerous instrument; or
“(2) Causes serious physical injury to another.”
Section 13A-8-43(a), Ala.Code 1975, provides:
“A person commits the crime of robbery in the third degree if in the course of committing a theft he:
“(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
“(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.”
Here, the State presented evidence from which the jury could have found beyond a reasonable doubt that Wilson murdered Walker during an attempt to take Walker’s van. Although Wilson did state that it was his intent to steal Walker’s laptop on the night of Walker’s murder (C. 520), he also stated that the “original plan was going over there and taking the van” and that he and his codefendants had talked about “going over there and hitting Mr. Walker and knocking him out and taking the keys.” (C. 516-17.) From these statements, the jury could have reasonably inferred that, although the van may not have been taken the evening Walker was murdered, Wilson was attempting to rob Walker of his van when he murdered Walker.
Wilson relies on his statement that he did not attempt to steal the van until the day after Walker was murdered and the implication from that statement that Walker was not murdered during the course of a robbery. Wilson’s rebanee is misplaced, though, because a theft need not occur for the elements of robbery to be satisfied.
“ ‘[R]obbery ... is a crime against the person; it does not require that a theft be accomplished for the elements of robbery to be established.’ Ex parte Verzone, 868 So.2d 399, 402 (Ala.2003). ‘Proof of an actual taking of property is not required to sustain a conviction for robbery.’ Craig v. State, 893 So.2d 1250, 1256 (Ala.Crim.App.2004). ‘ “[T]he former crime of attempted robbery now constitutes robbery.” ’ Casey v. State, 925 So.2d 1005, 1006 (Ala.Crim.App.2005) (quoting Petty v. State, 414 So.2d 182,183 (Ala.Crim.App.1982)).”
Evans v. State, 82 So.3d 766, 769 (Ala.Crim.App.2011).
Accordingly, the State’s evidence was sufficient to sustain Wilson’s conviction for murder made capital because it occurred during the commission of a robbery. *811 Therefore, this issue does not entitle Wilson to any relief.
XXVIII.
Wilson next argues that the circuit court erred by allowing the victim’s brother to sit at the prosecution’s table during the trial. Specifically, Wilson contends the presence of the victim’s brother denied him a fair trial and a reliable sentencing determination, i.e., one free from passion and prejudice. Wilson made no objection to the victim’s presence at the prosecution’s table; therefore, this Court will review this claim for plain error. See Rule 45A, Ala. RApp. P.
“At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion.” Rule 615, Ala. R. Evid. This rule, however, does not authorize the exclusion of “a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim’s guardian, or the victim’s family.” Id.
Walker’s brother was present as the victim’s representative. See § 15-14-56, Ala. Code 1975 (grounds for permitting a victim’s representative to attend are: death of the victim; disability; hardship; incapacity; physical, mental, or emotional condition; age; or other inability). “In Alabama, a representative of a victim has a statutory right to sit at counsel table.” Grimsley v. State, 678 So.2d 1197, 1210 (Ala.Crim.App.1996); §§ 15-14-53, 15-14-56, Ala.Code 1975. The fact that Walker’s brother testified does not alter this statutory right. See Johnson v. State, 648 So.2d 629, 633-34 (Ala.Crim.App.1994) (holding it was not error to allow victim’s representative to testify, despite her presence at the prosecution’s table). Thus, it was not error, much less plain error, for the circuit court to allow Walker’s brother to sit at the prosecution’s table. Accordingly, this issue does not entitle Wilson to any relief.
XXIX.
Wilson next argues that the circuit court erred by allowing the State to introduce unsubstantiated and irrelevant evidence of Wilson’s motive. Specifically, Wilson refers to the circuit court’s decision to allow Investigator Luker to testify about his discovery of suitcases, found behind a hidden panel above the fireplace, that contained coins and jewelry. Wilson argues that the evidence was speculative, and that it was highly prejudicial because it suggested that Wilson was aware of and was searching for the suitcases. Because Wilson did not object to this testimony, this issue will be reviewed for plain error only.[17] Rule 45A, Ala. RApp. P.
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid. “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.” Rule 402, Ala. R. Evid. “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *812 unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Rule 403, Ala. R. Evid. The determination whether the probative value of evidence is substantially outweighed by its prejudicial value is vested in the trial court, and the court’s determination on that issue will not be disturbed absent a clear abuse of discretion. Doster v. State, 72 So.3d 50, 90 (Ala.Crim.App.2010) (quoting Killingsworth v. State, 33 So.3d 632, 638 (Ala.Crim.App.2009), quoting in turn Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997)).
Although Wilson did not admit to being aware of the suitcases full of jewelry and coins or to putting holes in the interior walls of Walker’s house in an effort to locate the suitcases, Investigator Luker’s testimony regarding his discovery of the suitcases was probative of the issue of motive. Wilson’s statement to police indicated that he knew Walker and Walker’s son, that he had previously visited Walker’s house, that he had searched Walker’s home immediately before the murder, and that he had forced his way into multiple rooms with a screwdriver. From this evidence, the jury could have reasonably inferred that Wilson was familiar with Walker’s home and his valuables and that it was his intent, at least in part, to enter Walker’s house and locate valuables, including the suitcases filled with jewelry and coins. Accordingly, Investigator Luker’s testimony was highly probative of Wilson’s motive to commit the crime of burglary. Further, although Investigator Luker’s testimony regarding his discovery of the suitcases was indeed prejudicial, as is all evidence against a defendant, its prejudicial value did not substantially outweigh the probative value in this case. See Rule 403, Ala. R. Evid.
Because Investigator Luker’s testimony regarding the discovery of the suitcases in the wall was relevant to Wilson’s motive, no error, much less plain error, occurred by its admission. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Wilson to any relief.
XXX.
Wilson next argues that the circuit court erred by allowing the State and its witness to make irrelevant and prejudicial references to the codefendants and their confessions. Wilson argues that the State’s comments violated his right to a fair trial, his right to confront witnesses, and his right to a reliable sentencing determination.
In general, commenting on a co-defendant’s conviction or confession has been held to be error. In Stokes v. State, 462 So.2d 964 (Ala.Crim.App.1984), this Court stated:
“A survey of the Alabama cases on this point reveals that disclosure of the outcome of a co-defendant’s case has been denounced whether it occurred in argument, see Knowles v. State, 44 Ala.App. 163, 204 So.2d 506 (1967) (Prosecutor’s statement that other defendants had already pled guilty); Bell v. State, 41 Ala.App. 561, 140 So.2d 295 (1962) (Prosecutor’s statement that co-defendant had confessed); Lowery v. State, 21 Ala.App. 352, 108 So. 351 (1926) (District attorney’s comment that one person had already been convicted); Felder v. State, 20 Ala.App. 603, 104 So. 444 (1925) (Prosecutor’s comment that, ‘The other man had pleaded guilty’), in the State’s case-in-chief, see Williams v. State, 369 So.2d 910 (Ala.Crim.App.1979) (State’s witness asked whether he testified in case when co-defendant was convicted); Lane v. State, 40 Ala.App. 174,109 So.2d 758 (1959) (State asked co-indictee the outcome of his prosecution); Evans v. *813 State, 39 Ala.App. 498, 105 So.2d 831 (1958) (District attorney asked accomplice whether he was guilty of same offense with which defendant was charged), or during the presentation of the defense, see Dickens v. State, 49 Ala.App. 480, 273 So.2d 240 (1973) (Defendant questioned, on cross-examination, about co-defendant’s guilty plea); McGhee v. State, 41 Ala.App. 669, 149 So.2d 1 (1962) (Defendant sought to present evidence of co-defendant’s acquittal); Hill v. State, 210 Ala. 221, 97 So. 639 (1923) (Defendant claimed his own prosecution should be barred by accomplice’s acquittal).
“In all of the Alabama cases cited above, the reviewing courts have disapproved of reference to the disposition of a co-defendant’s case on the theory that the outcome of another’s prosecution is simply irrelevant to the guilt or innocence of the defendant and may not be received as substantive evidence at defendant’s trial. See, e.g., Hill v. State, 210 Ala. 221, 97 So. 639 (1923).”
462 So.2d at 966-67. The references to Wilson’s codefendants of which he complains will be addressed in turn.
A.
Wilson first complains of several questions posed by the State during voir dire. Wilson did not object to the questions; therefore, these questions will be evaluated under a plain-error standard.
State: ‘What I want to make sure — and I can’t read your minds, but your heart and soul — by looking at you right now, prospective members of the jury, do you think that because David Wilson was 20 years old — just because of his age, that gives him the right and other alleged co-defendants to allegedly commit capital offenses, rob and burglarize and kill a 64-year-old man?”
(R. 70.)
State: “Now, I want to call out some other names real quickly, if you know these people. These are alleged co-defendants also charged with David Wilson. I expect Mr. David Wilson— I will give you an address — had lived at ... in Dothan, Alabama. That is the address where they lived. That may jog your memory. I believe he is about five-eleven, 178 pounds. Of course, you see him here at the table.
“Matthew Marsh, one of the other co-defendants that was arrested and charged? Does anybody know Matthew Lee Marsh, who lived at ..., Dothan, Alabama. And I believe Mr. Marsh had a blue — light green, whatever, Geo vehicle that he drove around with a handicapped tag. Does that jog your memory? I an asking you about the defendants. Or if you know their parents? That’s one of those hard questions. You know, you didn’t ask me about his parents. I know the parents. I am standing up here in the open courtroom. I am giving you the defendants’ names. And if you know them or I give you the addresses, you are going to know who the parents are, if you know them is what I’m asking. Okay. So I would like to know that. I believe Mr. Marsh was five-ten, 240.
“(Whereupon, there was no response from the jury venire.)”
State: “Catherine Nicole ‘Kitty’ Corley lived at 1008 South Bell Street. Anybody know her? Does that ring a bell in any manner or fashion?
“(Whereupon, there was no response from the jury venire.)”
State: “Michael Ray Jackson, ..., Do-than, Alabama. Anybody know Mi *814 chael Jackson? I believe Mr. Jackson also worked for the City of Dothan. Specifically, had a job working with the leisure services. He may be involved in any activities or with children — does anybody know Michael Jackson?”[18]
(R. 87-89.)
The foregoing questions to the jury veni-re were not comments on the convictions or confessions of Wilson’s codefendants. Instead, they were questions designed to determine whether any potential jurors knew Wilson’s codefendants. For the purpose of obtaining an impartial jury, both parties certainly are entitled to question the jury venire as to whether its members know the codefendants or their families. Thus, it was not error, plain or otherwise, for the circuit court to allow the questions. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Wilson to any relief.
B.
Wilson next argues that the following exchange between the State and Investigator Luker constituted a comment on a codefendant’s confession:
State: “So the van had been recovered already?”
Witness: “Yes, sir. When we interviewed Mr. Wilson, it had been recovered. We had talked to Matthew Marsh and — ”
State: “Not what he said, but did you talk to Marsh?”
Witness: “We talked to Marsh and then was able to recover the van.”
(R. 281-82.) At most, the inference to be drawn from Investigator Luker’s answer was that Marsh had knowledge of the whereabouts of Walker’s van. Investigator Luker’s answer did not indicate that Marsh had made a confession. Moreover, from the fact that Marsh knew the whereabouts of the van, it could have reasonably been inferred that the van was recovered from his property. McNabb v. State, 887 So.2d 929, 971 (Ala.Crim.App.2001) (holding that “testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred”). Therefore, Wilson has not met his burden to establish that plain error occurred and thus is not entitled to any relief on this issue. Rule 45A, Ala. R.Crim. P.
C.
Wilson next argues that the following explanation from Investigator Luker as to why he did not submit evidence from the crime scene for DNA testing was a comment indicating that Wilson’s code-fendants had confessed:
Witness: ‘We had Mr. Wilson’s confession, as well as the other co-defendants saying the same thing that Mr. Wilson — ”
Defense: “Objection, to relevance.” Court: “Sustained as to what the co-defendants said.”
(R. 295.)
Wilson appears to argue that, although the circuit court sustained his objection, the circuit court erred by failing to give a curative instruction. Wilson did not request a curative instruction; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
Assuming the circuit court erred by failing to give a curative instruction, any error was harmless and thus did not rise to the level of plain error. Rule 45A, Ala. R.App. P. Here, Investigator Luker made an isolated remark and did not go into any of the *815 details of the codefendants’ statements. Giving a curative instruction regarding the fleeting remark may have drawn more unwanted attention to the remark. Further, Wilson, himself, confessed to his participation in Walker’s murder, and Walker’s property was found in Wilson’s house. Under the facts of this case, this Court cannot say that the circuit court’s failure to give a curative instruction adversely affected the outcome of the trial, Ex parte Walker, 972 So.2d 737, 752 (Ala.2007), or was “so egregious ... that [it] seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998).
Consequently, the circuit court’s error, if any, in failing to give a curative instruction regarding Investigator Luker’s remark did not rise to the level of plain error. Rule 45A, Ala. R.App. P. Therefore, Wilson is not entitled to any relief on this issue.
D.
Wilson also argues that the State’s question regarding the timing when Jackson’s statement was given to police constituted an improper comment on Jackson’s confession:
State: “One other reference to that question. Let me show you in my book — flip over to a statement that was taken from Michael Ray Jackson. I’ll show you my copy.”
Defense: “Your honor, I am going to object to relevance.”
Court: “We are fussing over the times.”
State: “That’s the last question I will ask, Judge.”
Court: “For what it’s worth.”
State: “My question to you, the statement taken from Michael Ray Jackson, what was the time? The time it was taken from Michael Ray Jackson, what was the date and time?”
Witness: “April the 14th, 2004.”
State: “Now, in the upper left-hand corner, this huge file, computer generated, what does it show the date and the time this was run?”
Witness: “3/02/06 at 1:13.”
(R. 417.)
Assuming, without deciding, that it was error to admit evidence establishing that a codefendant made a statement without divulging the content of that statement, that error does not warrant a reversal of Wilson’s convictions and sentences. Rule 45, Ala. R.App. P.; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As the record makes clear, neither the State nor its witness referred to Jackson’s statement as a confession. Instead, the question and answer, without going into the content of that statement, merely showed that the police took a statement from Jackson. The mere fact that Jackson made a statement to police is not incriminating. Further, as stated above, Wilson, himself, confessed to his participation in Walker’s murder, and Walker’s property was found at Wilson’s house. Cf. Gobble v. State, 104 So.3d 920, 957 (Ala.Crim.App.2010) (holding that the erroneous admission of comments relating to a codefendant’s statement was harmless when the defendant testified to those same facts). Based on the facts in this case, this Court holds that any error in the admission of testimony to the effect that a code-fendant made a statement was harmless. Therefore, this issue does not entitle Wilson to any relief. Rule 45, Ala. R.App. P.; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824,17 L.Ed.2d 705 (1967).
XXXI.
Wilson next argues that the circuit court erred in double counting rob *816 bery and burglary as both element of the capital offenses and as aggravating circumstances in the penalty phase of the trial.[19] Specifically, Wilson argues that, because robbery and burglary were used as elements of the capital offenses in the guilt phase and aggravating circumstances in the penalty phase, the State has failed to narrow the class of cases eligible for the death penalty. See, e.g., Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
In Vanpelt v. State, 74 So.3d 32, 89 (Ala.Crim.App.2009), this Court rejected a challenge to double counting as follows:
“Contrary to Vanpelt’s assertions, there is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A-5-45(e), Ala.Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily required, Vanpelt is not entitled to any relief on this issue. § 13A-5-45(e), Ala.Code 1975.”
74 So.3d at 89.
Because Wilson’s arguments are contrary to established precedent and he has offered this Court no principled reason to question the validity of that precedent, this issue does not entitle him to any relief.
XXXII.
Wilson next argues that by death-qualifying the jury, the circuit court impermissibly produced a conviction-prone jury. Wilson argues that death-qualifying the jury is a “‘procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction.’ Baze v. Rees, 553 U.S. 35, 84 (2008) (Stevens, J., concurring).” (Wilson’s brief, at 96-97). Wilson did not object to the circuit court’s decision to death-qualify the jury (R. 10); therefore, this issue will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.
The United States Supreme Court has upheld the constitutionality of death-qualifying a jury. See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), this Court addressed an identical claim to Wilson’s— *817 that death-qualifying juries results in an unconstitutional conviction because such juries are biased in favor of conviction.
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis, 718 So.2d at 1157 (footnote omitted). See also McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009). The practice of death-qualifying juries has been repeatedly held constitutional. Therefore, this Court finds no error, much less plain error, in the circuit court’s decision to death-qualify the jury. Accordingly, this issue does not entitle Wilson to any relief.
XXXIII.
Wilson’s final argument is that evolving standards of decency have rendered Alabama’s method of execution unconstitutional. Specifically, Wilson argues that Alabama’s method of execution — lethal injection — has not been found to comply with the standards established in Baze.
Addressing an identical argument in Albarran v. State, 96 So.3d 131, 202 (Ala.Crim.App.2011), this Court stated:
“This issue has been addressed by both the Alabama Supreme Court and the United States Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
‘“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [ (2008) ], and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.” Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.” Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Ala *818 bama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
“11 So.3d at 339. See also Vanpelt v. State, 74 So.3d 32, at 90 (Ala.Crim.App.2009) (holding that lethal injection is not unconstitutional).
“Because this issue has been raised and rejected by the Alabama Supreme Court, the United States Supreme Court, and this Court, it is without merit.”
Albarran, 96 So.3d at 202.
Accordingly, this issue does not entitle Wilson to any relief.
XXXIV.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Wilson’s convictions and his sentence of death. Wilson was indicted for, and convicted of, two counts of capital murder — one count of capital murder for taking the life of Walker during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975, and one count of capital murder for taking the life of Walker during the course of a burglary, see § 13A-5-40(a)(4), Ala. Code 1975.
The record does not reflect that Wilson’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In making this determination, the circuit court found that the State proved the existence of the following three aggravating circumstances: 1) that the capital offense was committed while Wilson was engaged in the commission of a burglary, see § 13A-5-49(4), Ala.Code 1975; 2) that the capital offense was committed while Wilson was engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975; and 3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(4), Ala.Code 1975.
Regarding mitigating circumstances, the circuit court stated that it had “considered all of the statutory mitigating circumstances as well as others raised by the defendant.” (C. 384.) The court then found that the defense established the following statutory mitigating circumstances: 1) that Wilson had no significant history of prior criminal activity, see § 13A-5-51(l), Ala.Code 1975; and 2) that Wilson was a younger adult — 20 years old — at the time of the offense, see § 13A-5-51(7), Ala.Code 1975. The court also found the following nonstatutory mitigating circumstances: 1) that Wilson’s mother had attempted suicide when he was young; 2) that Wilson’s parents were divorced; 3) that Wilson had been shuffled between his parents over the years; 4) that Wilson took medication as a child; and 5) that Wilson had volunteered with Red Cross Disaster Relief. The sentencing order shows that the circuit court properly weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced Wilson to death. The record supports the circuit court’s findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstances and the mitigating circumstances to determine whether Wilson’s sentence of death is proper. After independently weighing the aggravating circumstances and the mitigating circumstances, this Court finds that Wilson’s death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must now determine whether Wilson’s sentence is excessive or *819 disproportionate when compared to the penalty imposed in similar cases. Wilson was convicted of one count of murder during a robbery and one count of murder during a burglary. Further, the circuit court found that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. A sentence of death has been imposed for similar crimes throughout this State. See Melson v. State, 775 So.2d 857, 868 (Ala.Crim.App.1999); Washington v. State, 922 So.2d 145 (Ala.Crim.App.2005); Brown v. State, 11 So.3d 866, 901 (Ala.Crim.App.2007). Therefore, this Court finds that the sentence was neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely affected Wilson’s substantial rights and has not found any. See Rule 45A, Ala. R.App. P.
Accordingly, Wilson’s convictions and his sentence of death are affirmed.
AFFIRMED.
BURKE and JOINER, JJ., concur.
WELCH and KELLUM, JJ., concur in the result.

. Jimmy Walker was not related to the victim, Dewey Walker.

.A few days later, Investigator Luker returned to the scene and found a hidden panel above the fireplace. Behind the panel were two suitcases containing jewelry and a large number of coins.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. At trial, Investigator Luker testified that Walker's dog was a two-pound Chihuahua.

. Investigator Lulcer found two knives — a pocketknife and a carpet knife — in Walker's house. Neither were located in the kitchen near Walker's body, but rather in a bedroom.

. While executing a search warrant at Wilson's home, officers recovered a portion of the stereo equipment.

. Wilson challenges the circuit court’s findings only as they relate to potential jurors J.C., J.D., and D.W.

. Two of the African-Americans had already informed the Court that they opposed the death penalty, prompting their being questioned about the death penalty, and one African-American's young age prompted his being questioned about the death penalty.

. Because the State’s use of J.D.’s criminal record was a race-neutral reason for his removal, this Court will not address Wilson’s challenge to the State’s use of J.D.'s age as a reason for striking him. Thompson v. State, [Ms. CR-05-0073, Feb. 17, 2012] — So.3d —, — (Ala.Crim.App.2012) (”[W]hen more than one reason was given for striking some veniremembers, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect.”). However, this Court notes that the State struck both white and African-Americans based on age. Further, nothing in the record indicates that this reason was pretextual.

. Wilson did move to suppress his statement on the ground that it was not voluntarily given; however, he did not argue that the State’s failure to fully record the statement rendered the statement involuntary or untrustworthy. See Davis v. State, 42 So.3d 162, 168 (Ala.Crim.App.2009) ("The statement of specific grounds of objection waives all grounds not specified_”).

. Wilson rightly does not argue that Investigator Luker lacked probable cause to arrest him; instead, Wilson argues only that the State failed to establish exigent circumstances to justify his warrantless, in-home arrest.

. Wilson argues that there is a missing link because "Robert [Byrd], the coroner who removed the victim’s body from the scene of the crime, testified that he received the body from '[e]ither Mike Etress or Tony Luker.’ ” (Wilson’s reply brief, at 18 (citing R. 537).) Actually, Byrd testified that it was ”[e]ither Mike Etress or Tony Luker,” who "identified Mr. Walker’s [body] as Mr. Walker” when Byrd arrived at the scene. (R. 537.)

. In a footnote, Wilson appears to raise an argument that it was error to allow the State to suggest that Wilson hit Walker 114 times. Wilson argues that the evidence did not support such a suggestion because, when asked if Walker’s injuries were sustained separately, Dr. Enstice stated that "some could have occurred at the same time.” (R. 498.)
Both the State and the defense have the right to argue every legitimate inference from the evidence. Broadnax v. State, 825 So.2d 134, 179 (Ala.Crim.App.2000). Dr. Enstice’s statement was not definitive, but rather allowed for the possibility that some injuries could have occurred at the same time. Moreover, according to Dr. Enstice, her estimate of 114 contusions and abrasions was conservative. (R. 497.) Thus, the State's inference was a legitimate one. To the extent Wilson raises this argument, it is without merit.

. This Court has explained that to sustain a conviction "under § 13A-5-40(a)(2) for capital robbery-murder,” the State must prove that the defendant used "violence or intimidation” in an attempt to take the victim's property. See Connell v. State, 7 So.3d 1068, 1089-90 (Ala.Crim.App.2008).

. Wilson was 20 years old at the time of Walker’s murder.

. Wilson does not specify which elements he alleges the circuit court omitted from its charge.

. Although Wilson asserts in his brief that he objected to the admission of this evidence, the record does not support his contention. Investigator Luker testified about his discovery of the suitcases without objection. (R. 270-71.) Wilson's objection was to the admission of photographs of the coins and jewelry, which were offered later at trial by the State.

. Street addresses have been omitted.

. This Court has previously held that the practice of double counting is constitutionally permissible. Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007).